636 A.2d 505

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. RONALD VALENTINE, DEFENDANT–RESPONDENT.

Argued November 9, 1993—Decided February 2, 1994.

538

*Deborah Bartolomey,* Deputy Attorney General, argued the cause for appellant (*Fred DeVesa,* Acting Attorney General of New Jersey, attorney).

*Neal M. Frank,* Designated Counsel, argued the cause for respondent (*Zulima V. Farber,* Public Defender, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

At issue is whether a police officer's pat-down of defendant during a legitimate investigatory stop was constitutional under the Fourth Amendment of the Federal Constitution and Article I, paragraph 7 of the New Jersey Constitution. Defendant, Ronald Valentine, indicted for possession of a knife by a person previously convicted of a crime, contrary to *N.J.S.A.* 2C:39–7, moved to suppress the knife on the ground that it was the subject of an illegal search and seizure. The trial court denied defendant's motion to suppress, holding that both the investigatory stop and the frisk of defendant were constitutional, whereupon defendant entered a guilty plea. The Appellate Division unanimously agreed that the investigatory stop was constitutional, but a majority of that court concluded that the search did not survive constitutional scrutiny, wherefore it reversed the conviction. 269 *N.J.Super.* 508, 636 *A.2d* 69 (1993). The dissenting judge would have upheld the pat-down as constitutional. The State appealed as of right, *Rule* 2:2–1(a), and we now reverse.

I

On June 22, 1990, at approximately 12:10 a.m., Officer Nuccio was on routine patrol in a marked police car. As he patrolled the city of Red Bank alone, he observed a woman, Debra Collier, standing in the middle of Willow Street onto which he had just turned. As Officer Nuccio pulled up closer to the woman, he observed defendant duck behind a tree, which was located on the side of Willow Street adjacent to the Jersey Central Power and Light storage yard and across from a residential area.

Officer Nuccio testified that he was personally familiar with the area as a high-crime area. In fact, he testified that he had made well over a hundred arrests in the area for offenses ranging from

burglaries, robberies, and purse snatchings to possession and distribution of controlled dangerous substances.

On observing defendant duck behind the tree, Officer Nuccio alighted from his car and approached defendant. Although the area was not well lit, Officer Nuccio spotted defendant walking out from behind the tree. Defendant was walking towards Officer Nuccio with his hands in his pockets. As defendant moved closer to him, Officer Nuccio recognized him from previous encounters. Officer Nuccio testified that he was aware that defendant had a lengthy arrest sheet, "that he had been involved in weapons offenses, armed robberies, prior C.D.S. complaints and stuff like that."

Officer Nuccio asked defendant "what he was doing." Defendant responded that he was "about to urinate, until he saw the police vehicle." Debra Collier testified that Officer Nuccio questioned defendant about why he needed to urinate behind a tree, inasmuch as he lived "right around the corner." According to Collier, defendant responded that "when nature call [sic] that happens, sometime just like that."

Officer Nuccio testified that he was "uncomfortable" with defendant's responses to his questions and defendant's overall demeanor. According to Officer Nuccio, defendant would not make eye contact with him, continually looked around, and was evasive in his answers to the questions put to him. As a result, Officer Nuccio commanded defendant to remove his hands from his pockets and move over toward the police car. Defendant complied, but, according to Officer Nuccio, he continued acting nervously. At that point, Officer Nuccio radioed for backup because he "didn't feel comfortable [by himself] the way things were going together."

Officer Nuccio then conducted a pat-down of defendant. On conducting the pat-down, Officer Nuccio felt a hard object in defendant's right jacket pocket. The officer removed the object— a locked blade knife in the open position—and put it in his pocket. Backup then arrived, and the police placed defendant under arrest.

In denying defendant's motion to suppress the knife seized during the pat-down, the trial court concluded that sufficient evidence justified the pat-down:

> [H]e's got a guy with his hands in his pocket. Coming out from behind the bushes. In a very high crime area. Whose [sic] been arrested before and [sic] armed robbery, weapons offenses, burglaries, robberies in that area and its twelve o'clock at night. And he won't make any eye contact and he's looking around.

The Appellate Division disagreed. Over the dissent of Judge Keefe, the Appellate Division concluded that the evidence was insufficient to support the limited frisk for weapons, even though the evidence justified the investigatory stop. Noting that defendant had complied with Officer Nuccio's request to remove his hands from his pockets and to move toward the police car, that no evidence suggested that defendant had behaved in a hostile and threatening manner, and that Officer Nuccio had not identified the criminal activity he suspected of defendant, the Appellate Division concluded that Officer Nuccio could not reasonably have believed that defendant might be armed and dangerous. The court also was reluctant to encourage police officers to rely on their knowledge of a person's prior criminal record as a reason to support a frisk. Accordingly, the Appellate Division found the frisk unconstitutional. The dissenting judge, however, noting the officer's isolation, the late hour, the high-crime area, defendant's furtive movements combined with his suspicious behavior, and his prior convictions for weapons offenses and armed robberies, found Officer Nuccio's pat-down reasonable.

## II

In the landmark case of *Terry v. Ohio,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968), the Supreme Court established the standards governing what has come to be known as "stop and frisk." In *Terry,* a police officer observed three men repeatedly looking into a store. The officer concluded that the three were about to commit a robbery. He approached the men, identified himself as a police officer, and asked their names. After receiving a mumbled reply, the officer conducted a pat-down of the men, finding

two weapons. In analyzing the constitutionality of the seizure, the Court examined whether (1) the officer had been justified in making the initial stop; (2) the officer had been justified in frisking defendants; and (3) the officer's frisk had been sufficiently limited in its scope. *Id.* at 20, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 905.

As we stated in *State v. Thomas,* 110 *N.J.* 673, 678, 542 *A.*2d 912, 915 (1988), "The first component of the *Terry* rule concerns the level of reasonable suspicion that must exist before an 'investigatory stop' legitimately may be undertaken." The essence of that standard is " 'that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " *Ibid.* (quoting *United States v. Cortez,* 449 *U.S.* 411, 417, 101 *S.Ct.* 690, 695, 66 *L.Ed.*2d 621, 629 (1981)); *accord State v. Davis,* 104 *N.J.* 490, 504, 517 *A.*2d 859, 867 (1986) (adopting totality-of-circumstances standard announced in *Cortez* ).

■ The Appellate Division unanimously concluded that under the totality of the circumstances, Officer Nuccio's investigatory stop of defendant was constitutional under the first component of *Terry.* The issue here focuses on the second component of *Terry,* namely, the standard by which we must judge an officer's decision to frisk a suspect incident to a lawful investigatory stop. Whether a police officer's protective search for weapons is justified is a separate question from whether the stop was permissible in the first place. *Thomas, supra,* 110 *N.J.* at 678–79, 542 *A.*2d at 915.

The *Terry* Court identified the concerns that it considered in establishing a workable standard to govern the constitutionality of a frisk incident to a lawful stop:

We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition

of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of injuries are inflicted with guns and knives.

[392 *U.S.* at 23–24, 88 *S.Ct.* at 1881, 20 *L.Ed.*2d at 907 (footnote omitted).]

Based on those concerns, the *Terry* Court established the now well-known and often-quoted standard governing the frisk of a suspect incident to a lawful investigatory stop.

The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

[*Id.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909 (footnote and citation omitted).]

Although we recognize that Article I, paragraph 7 of the New Jersey Constitution may give greater protection against unreasonable searches and seizures than does the Fourth Amendment, *see, e.g., State v. Bruzzese,* 94 *N.J.* 210, 216, 463 *A.*2d 320, 323 (1983), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984), we do not interpret the New Jersey Constitution to demand a higher standard than the Fourth Amendment in order to justify a frisk incident to a lawful investigatory stop. *See State v. Lund,* 119 *N.J.* 35, 573 *A.*2d 1376 (1990); *Thomas, supra,* 110 *N.J.* 673, 542 *A.*2d 912; *Davis, supra,* 104 *N.J.* 490, 517 *A.*2d 859; *State ex rel. H.B.,* 75 *N.J.* 243, 381 *A.*2d 759 (1977) (all applying *Terry* standard); *see also State v. Dilley,* 49 *N.J.* 460, 231 *A.*2d 353 (1967) (applying standard later adopted in *Terry*).

*Terry* directs that courts measure the reasonableness of a pat-down incident to a lawful investigatory stop with an objective standard ("a reasonably prudent man"). *Thomas, supra,* 110 *N.J.* at 679, 542 *A.*2d at 915. Nonetheless, courts judge the reasonableness of the pat-down within the context of the circumstances confronting the police officer. Thus, the *Terry* standard is an objective one, but

[t]he process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are

permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

[*Cortez, supra,* 449 *U.S.* at 418, 101 *S.Ct.* at 695, 66 *L.Ed.*2d at 629.]

*Terry,* however, does not permit police officers to conduct pat-downs whenever the circumstances satisfy only the first component of *Terry*—namely, whenever some objective manifestation exists that the suspect was or is involved in criminal activity. To the contrary, *Terry* created

an exception to the requirement of probable cause, an exception whose "narrow scope" this Court "has been careful to maintain." Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown [sic] to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. Nothing in Terry can be understood to allow a generalized "cursory search for weapons" or, indeed, any search whatever for anything but weapons.

[*Ybarra v. Illinois,* 444 *U.S.* 85, 93–94, 100 *S.Ct.* 338, 343, 62 *L.Ed.*2d 238, 247 (1979) (footnote and citation omitted).]

Although a generalized cursory search for weapons is impermissible, "[v]arious circumstances may give rise to an objectively reasonable suspicion that a suspect is armed and dangerous," *Thomas, supra,* 110 *N.J.* at 679, 542 *A.*2d at 915, justifying a search for weapons. In certain circumstances, "the right to frisk must be immediate and automatic if the reason for the stop is . . . an articulable suspicion of a crime of violence." *Terry, supra,* 392 *U.S.* at 33, 88 *S.Ct.* at 1886, 20 *L.Ed.*2d at 913 (Harlan, J., concurring). *See, e.g., People v. Shackelford,* 37 *Colo.App.* 317, 546 *P.*2d 964, 967 (1976) (upholding protective search where defendant was suspected of rape and robbery); *State v. Kea,* 61 *Haw.* 566, 606 *P.*2d 1329, 1332 (1980) (upholding protective search where defendant was suspected of being about to commit assault with deadly weapon); *State v. Gilchrist,* 299 *N.W.*2d 913, 917–18 (Minn.1980) (upholding protective search where defendant was suspected of homicide); *Mays v. State,* 726 *S.W.*2d 937, 944 (Tex.Cr.App.1986) (upholding protective search where defendants were suspected of burglary), *cert. denied,* 484 *U.S.* 1079, 108 *S.Ct.* 1059, 98 *L.Ed.*2d 1020 (1988).

Even in situations in which an officer does not believe a suspect is engaged or about to become engaged in violent criminal activity, the right to frisk for weapons during a permissible investigatory stop is frequently automatic where a police officer has a specific and objectively-credible reason to believe that the suspect is armed. *See, e.g., Adams v. Williams,* 407 *U.S.* 143, 146–47, 92 *S.Ct.* 1921, 1923, 32 *L.Ed.*2d 612, 617–18 (1972) (upholding protective search based on informant's tip that suspect was carrying "a gun at his waist"); *State v. Collins,* 479 *A.*2d 344, 346 (Me.1984) (upholding protective search based on officer's knowledge that defendant may have been armed on prior occasion); *State ex rel. H.B., supra,* 75 *N.J.* at 250–51, 381 *A.*2d 759, 762–63 (upholding protective search based on informant's tip that suspect was carrying a gun); *cf. Thomas, supra,* 110 *N.J.* at 684, 542 *A.*2d at 918 (implying that justification for frisk would have been stronger had informant indicated that defendant had gun).

Oftentimes, however, a law-enforcement officer is confronted with far less clear circumstances. Even in those more murky and difficult situations, however, law-enforcement officers must make instantaneous decisions about whether a frisk for weapons is justifiable. The task is an unenviable one often fraught with life-and-death consequences.

We are mindful of Judge Friendly's warning that "courts should not set the test of sufficient suspicion that the individual is 'armed and presently dangerous' too high when protection of the investigating officer is at stake." *United States v. Riggs,* 474 *F.*2d 699, 705 (2d Cir.), *cert. denied,* 414 *U.S.* 820, 94 *S.Ct.* 115, 38 *L.Ed.*2d 53 (1973). Over fifteen years ago, Chief Justice Hughes realized the importance of a realistic approach to reviewing police behavior in the context of the ever-increasing violence in society. *State ex rel. H.B., supra,* 75 *N.J.* at 245, 381 *A.*2d at 759–60.

As the front line against violence, law-enforcement officers are particularly vulnerable to violence often becoming its victims. Since 1984, nine New Jersey police officers have been killed in the line of duty. In 1992, 3,988 police officers were assaulted in the

line of duty. *Uniform Crime Reports for the State of New Jersey—1992*, at 180–81. Violence against law-enforcement officials is not unique to New Jersey. From 1982–1991, 743 federal law-enforcement officers were killed in the line of duty in the United States. *See Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted—1991*.

■ We must evaluate the reasonableness of a *Terry* frisk in that context. Just as the decision concerning whether the initial investigatory stop is justified, the decision concerning whether a frisk for weapons is justified depends on all the facts and circumstances of the case. As we said in *Davis, supra*, 104 *N.J.* at 504, 517 *A.*2d at 867,

> to determine the lawfulness of a given seizure under New Jersey law, it is incumbent upon a reviewing court to evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions.

No mathematical formula exists for deciding whether the totality of the circumstances provide an officer with a reasonable belief that a suspect was armed and dangerous. *Id.* at 505, 517 *A.*2d at 867. "Such a determination can be made only through a sensitive appraisal of the circumstances in each case." *Ibid.* Although the cases are fact-sensitive, they, nevertheless, provide us with guideposts in our consideration of whether Officer Nuccio's pat-down of defendant was reasonable.

Some cases suggest that a suspect's offer of a weak ·alibi to explain his or her actions may help give rise to a reasonable suspicion that the suspect is armed. *See People v. Allen,* 50 *Cal.App.*3d 896, 123 *Cal.Rptr.* 80, 81 (1975) (discussing defendant's claim that he was on his way back to hotel when he was in fact walking away from hotel); *Davis, supra,* 104 *N.J.* at 496 n. 4, 517 *A.*2d at 862 (finding reasonable pat-down of suspects on stolen bicycles who claimed their car, which was nowhere to be found, had run out of gas and that bicycles were conveniently in vehicle's trunk).

■ Although a stop in a high-crime area does not by itself justify a *Terry* frisk, *see Maryland v. Buie,* 494 *U.S.* 325, 334–35 n. 2, 110 *S.Ct.* 1093, 1098 n. 2, 108 *L.Ed.*2d 276, 286 n. 2 (1990), the location of the investigatory stop can reasonably elevate a police officer's suspicion that a suspect is armed. *See United States v. Trullo,* 809 *F.*2d 108 (1st Cir.) (upholding protective search and noting that officer's suspicions that narcotics dealer might be armed were justifiably elevated when officer confronted suspect in high-crime area known for drug dealing, and noticed bulge in suspect's pocket), *cert. denied,* 482 *U.S.* 916, 107 *S.Ct.* 3191, 96 *L.Ed.*2d 679 (1987).

■ Like the high-crime-area factor, the lateness of the hour at which an investigatory stop occurs cannot be the sole basis justifying a frisk for weapons. However, the lateness of the hour, like the location at which such a stop occurs, justifiably elevates a police officer's reasonable belief that a suspect is armed and dangerous. *See Lund, supra,* 119 *N.J.* at 48, 573 *A.*2d at 1383. That observation is especially true when the defendant's activity is entirely inconsistent with time of day. *See Collins, supra,* 479 *A.*2d at 345 (noting that time of 1:15 a.m. raised reasonable suspicions regarding defendant's carrying of office supplies in business district).

■ Moreover, a police officer's knowledge of a suspect's criminal history, especially where that history involves weapons offenses, is a relevant factor in judging the reasonableness of a *Terry* frisk. Although an officer's knowledge of a suspect's criminal history alone is not sufficient to justify the initial stop of a suspect or to justify a frisk of a suspect once stopped, an officer's knowledge of a suspect's prior criminal activity in combination with other factors may lead to a reasonable suspicion that the suspect is armed and dangerous. *Terry* itself acknowledges that police officers must be permitted to use their knowledge and experience in deciding whether to frisk a suspect. "[I]n determining whether the officer acted reasonably ... due weight must be given, not to his inchoate and unparticularized suspicion or hunch,

but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry, supra,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909. In many instances, a reasonable inference may be drawn that a suspect is armed and dangerous from the fact that he or she is known to have been armed and dangerous on previous occasions.

In *Thomas,* we suggested that an officer's knowledge that a defendant had been armed at a prior arrest would bolster an objectively-reasonable suspicion that the defendant was armed and dangerous at that stop. 110 *N.J.* at 684, 542 *A.*2d at 918. Likewise, the Supreme Court has implied that knowledge of a person's criminal history would be a factor supporting a legitimate frisk. *Ybarra, supra,* 444 *U.S.* at 93, 100 *S.Ct.* at 343, 62 *L.Ed.*2d at 246.

However, a frisk never will be justified based solely on an officer's knowledge of a suspect's criminal history. The Appellate Division's reliance on *United States v. Hairston,* 439 *F.Supp.* 515 (N.D.Ill.1977), and *State v. Giltner,* 56 *Haw.* 374, 537 *P.*2d 14 (1975) is therefore misplaced. In both of those cases, to justify his pat-down the police officer relied *exclusively* on his knowledge of the suspect's previous encounters with law enforcement. In *Hairston,* the officer stopped the defendant for a noisy muffler at two o'clock in the afternoon on a busy street. The defendant alighted from the car to present his license to the officer. The officer recognized the defendant as a convicted felon. Furthermore, the officer testified that he noticed a bulge in the defendant's pants. Without first patting down the defendant, the officer reached into the pants and removed a handgun.

The trial court found that the seizure was unconstitutional. First, the court rejected the notion, as we do today, that the sole fact that the defendant was a convicted felon justified the seizure. 439 *F.Supp.* at 518. Second, the court questioned whether the officer had actually seen a bulge in the defendant's pants. *Ibid.* Third, even if the officer had seen the bulge, the scope of the search "went far beyond what was 'minimally necessary.'" *Id.* at 519.

The officer in *Hairston* knew only that the defendant was a convicted felon. Nothing in the record suggested that the officer knew that the defendant had carried weapons previously. Here, Officer Nuccio had personal knowledge that Valentine had carried weapons on previous occasions. In addition, unlike Valentine, the defendant in *Hairston* took no action that could have reasonably led the officer to conclude that he was armed. Finally, the court in *Hairston* concluded that the scope of the search had been impermissible, where as the scope of the search conducted by Officer Nuccio was, without question, consistent with the dictates of *Terry*.

Likewise, in *Giltner, supra,* 537 *P*.2d 14, the sole reason for the frisk was the officer's knowledge that Giltner had been armed on a previous occasion. An elderly woman informed police officers of a disturbance at an unspecified part of an apartment building. The officers investigated and observed three men on the second-floor landing in the building. Without any evidence that the three men on the balcony were the same rowdy group to whom the elderly woman had referred, one of the officer's frisked Giltner because he recognized him as a person whom he had known to be armed on a previous occasion.

The Supreme Court of Hawaii held that the stop and frisk were impermissible, finding that

[t]here was nothing unusual or suspicious about the conduct of the defendant and his companions in this case. Nor was there anything in the surrounding circumstances which could have justified the seizure of the defendant. The officer could not point to specific and articulable facts from which he could have reasonably inferred that the defendant had committed, or was about to commit an offense. It was not enough that on a previous occasion, personally known to the officer, the defendant had been offensively armed.

[*Id.* at 17.]

Unlike the situation in *Giltner*, the circumstances of this case unquestionably warranted the stop of defendant. Moreover, unlike the situations in *Hairston* and *Giltner*, the justification for defendant's frisk by Officer Nuccio was not the sole fact that

defendant had been armed on a prior occasion. That was just one of the factors that Officer Nuccio considered.

██ Given the volatile times in which we live, we certainly cannot require police officers to ignore the fact that a suspect whom they are confronting has a history of criminal behavior, particularly weapons offenses. We acknowledge that permitting the use of a suspect's prior criminal history alone to justify a *Terry* frisk may lead to unwarranted intrusions on a suspect's constitutional protections in certain circumstances. We do not hold, however, that a suspect's criminal history alone may justify a *Terry* frisk. We hold merely that a *Terry* frisk is not automatically invalid because the frisking officer's reasonable suspicion is grounded, in part, by the suspect's prior criminal history. We see no reason to exclude evidence seized pursuant to such a frisk as a prophylactic device to curb potential police overreaching. As the *Terry* Court itself was aware, "[t]he exclusionary rule has its limitations . . . as a tool of judicial control. It cannot properly be invoked to exclude the products of legitimate police investigative techniques on the ground that much conduct which is closely similar involves unwarranted intrusions upon constitutional protections." *Id.* at 13, 88 *S.Ct.* at 1875, 20 *L.Ed.*2d at 901.

Moreover, considering a suspect's prior criminal activity is nothing extraordinary. Courts assessing the reasonableness of an officer's assessment of probable cause to arrest may consider evidence of prior crime on the part of the suspect. *See Brinegar v. United States*, 338 *U.S.* 160, 174–75, 69 *S.Ct.* 1302, 1310, 93 *L.Ed.* 1879, 1890 (1949). Professor LaFave explains that the reason for limiting the use of prior crime evidence at trials is not because the evidence is not relevant but because it has the unfair effect of overcoming the presumption of innocence. Wayne La-Fave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.2(d), at 579–83 (2d ed. 1987); *see also Commonwealth v. Gullett*, 459 *Pa.* 431, 329 *A.*2d 513, 517–18 (1974). That unfairness is not equally present when we are assessing an officer's articulable concerns for personal safety. In addition, courts commonly

use a defendant's prior criminal history in sentencing. To allow the judiciary to take prior criminal history into account in the review of probable cause determinations and in sentencing, while denying law-enforcement officers the power to take it into account when confronting a suspect on the street would make little sense. In sentencing defendants, trial courts view criminal history in order to determine what sentence will best protect the public from the defendant. The much more immediate need to protect oneself demands that we permit law-enforcement officers to take criminal history into account.

### III

Whether a frisk is reasonable depends on the facts in each case. Based on our review of the totality of circumstances, we find that Officer Nuccio reasonably concluded that defendant might be armed and dangerous, justifying the pat-down. Officer Nuccio's suspicion that defendant was engaged or about to become engaged in criminal activity was reasonable. Approaching a suspect believed to be engaged in criminal activity, Officer Nuccio was initially alarmed that defendant had his hands in his pockets. He asked defendant to remove his hands from his pockets and to explain why he had ducked behind a tree after seeing the police vehicle. Defendant gave a weak excuse, suggesting to Officer Nuccio that he was lying. Moreover, defendant refused to make eye contact with Officer Nuccio, and he repeatedly looked around the area. In addition, Officer Nuccio testified that he recognized defendant as someone who had a long history of criminal activity, including armed robberies and weapons offenses. All the foregoing occurred after midnight on a dark street known to Officer Nuccio as a high-crime area. For Officer Nuccio to conclude that the suspect might be armed and that his safety was in danger was eminently reasonable.

Based on that reasonable suspicion, Officer Nuccio conducted a pat-down of defendant's outer clothing. The pat-down was well within the scope permitted under *Terry*. 392 *U.S.* at 29, 88 *S.Ct.*

at 1884, 20 *L.Ed.*2d at 911. It was doubtless "confined in scope to an intrusion reasonably designed to discover [weapons] for the assault of the police officer." *Ibid.*

The decision to frisk and the scope of the frisk of defendant were unlike the frisk at issue in *Thomas, supra,* 110 *N.J.* 673, 542 *A.*2d 912. There, the police received an anonymous tip that a man named Ike was in possession of illegal drugs in a bar. *Id.* at 675, 542 *A.*2d at 913. When the officers entered the bar, they spotted the defendant, who fit the informant's description. One of the officers recognized the defendant from a prior arrest for drug possession. The officer immediately confronted the defendant, patting him down in order to discover "possible weapons or anything that [might have been] in his possession at the time." *Id.* at 676, 542 *A.*2d at 913.

Unlike the circumstances in this case, the circumstances in *Thomas* could not have reasonably caused the officers to fear for their safety. The frisk of Thomas occurred in a well-lit bar. Three officers were on the scene. The informant had given no indication that Thomas was armed, nor did any of the officers have knowledge of the fact that the defendant had been armed on previous occasions. Finally, the frisk of Thomas exceeded the permissible scope of a *Terry* frisk in that it was designed to uncover more than weapons. *See also Ybarra, supra,* 444 *U.S.* at 93–94, 100 *S.Ct.* at 343, 62 *L.Ed.*2d at 247; *Sibron v. New York,* 392 *U.S.* 40, 88 *S.Ct.* 1889, 20 *L.Ed.*2d 917 (1968) (both cases finding scope of frisk exceeded *Terry's* mandate).

Nor are the circumstances surrounding the frisk of defendant analogous to those at issue in *Lund, supra,* 119 *N.J.* 35, 573 *A.*2d 1376. There, a state trooper stopped a car for minor motor-vehicle violations. The trooper signalled the driver to pull the car over, and he pulled up behind the car. The trooper then observed the driver reach behind him to his left. *Id.* at 41, 573 *A.*2d at 1380. He approached the car from the passenger side, observing a windbreaker stuffed in the backseat in the vicinity of the movement that he had previously observed. The trooper also

observed a travel bag with a brown bag on top of it in the backseat. The trooper then asked for the driver's license and the car registration. The driver appeared nervous, according to the trooper. *Ibid.* Based on those facts, the trooper ordered the driver and passenger out of the car and conducted a *Terry* frisk of both of them, which revealed no weapons. *Id.* at 42, 573 A.2d at 1380. The trooper then proceeded to search the car, while his partner guarded the driver and passenger outside the car. The trooper removed the jacket, discovering a white towel stuck in the seat. On removing the towel, he discovered a large manila envelope containing cocaine. *Ibid.*

We concluded that the nervousness and the furtive movements of the driver did not establish a specific particularized basis for an objectively reasonable belief that defendants were armed and dangerous. *Id.* at 48, 573 A.2d at 1383. Unlike Valentine, the car occupants in *Lund* were not suspected of any criminal behavior. The sole justification for the stop was a motor-vehicle violation. Moreover, the officer in *Lund* had no knowledge that those defendants had carried weapons on previous occasions.

## IV

As previously stated, no mathematical formula exists for determining what set of facts gives rise to a reasonable belief that a suspect is a potential threat to an officer and thus justifies a protective search for weapons. Instead, we must balance the competing interests. Balancing the right to be protected from unwarranted and overbearing police intrusions against the State's need for effective law enforcement and police safety, we hold that the frisk of defendant was reasonable under the totality of the circumstances. Officer Nuccio's personal knowledge of defendant's prior criminal history of armed robberies, weapons and drug offenses, the fact that defendant initially had his hands in his pockets, defendant's decision to duck behind a tree after seeing a police car, defendant's nervousness, defendant's failure to make eye contact with Officer Nuccio, the high-crime nature of the area,

and the time of the night all contributed to Officer Nuccio's reasonable belief that defendant was armed and dangerous. The frisk of defendant was, therefore, reasonable.

Accordingly, we reverse the judgment of the Appellate Division and reinstate the conviction.

CLIFFORD, J., dissenting.

This case strikes me as not much more than a challenge to our ingenuity in teasing out of this slim record a range of nuances of conduct and speech that lead to a result favoring either admissibility or suppression. Had the issue come to us on a petition for certification rather than as an appeal as of right under *Rule* 2:2–1(a), I very much doubt that we would have taken the case. The controlling principles of law are firmly established; the problem arises with their application in an acutely fact-sensitive area. Because I think the majority in the court below has the better of the argument on that score, I would affirm substantially for the reasons set forth in its opinion.

*For reversal and reinstatement*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For affirmance*—Justice CLIFFORD—1.