REPORTED

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 0792

September Term, 2013

TORIAN A. UNDERWOOD

v.

STATE OF MARYLAND

Eyler, Deborah S.,
Kehoe,
Rodowsky, Lawrence F.
 (Retired, Specially Assigned),

JJ.

Opinion by Rodowsky, J.

Filed: October 7, 2014

Appellant, Torian A. Underwood, was convicted at a jury trial in the Circuit Court for Harford County of possession of cocaine, wearing, carrying or transporting a handgun in a vehicle and on his person, concealing a dangerous weapon, and speeding.[1]  He was sentenced to an aggregate term of seven years incarceration, with all but three and one-half years suspended and four years probation.  He presents one question for our review:

> "Did the lower court err in determining that the searching officer had a valid basis to perform a 'pat down' search of Mr. Underwood's person, and in failing to suppress the items found as a result of that search?"

For the reasons set forth below, we shall affirm.

### Facts and Procedural History

At the suppression hearing, the State's sole witness was the arresting officer, Corporal Neil Crouch, a twenty-three year veteran of the Havre de Grace Police Department.  At 10:59 p.m. on January 16, 2011, Corporal Crouch stopped the 2002 Cadillac being driven by Underwood who was traveling alone at a radar detected 58 m.p.h. in a 35 m.p.h zone.  As the officer approached, Underwood was sitting in the car "like a statute," with his eyes fixed forward and his hands in his lap.  Underwood apparently had ready for presentation in his left hand identifying information, consisting of his driver's license, auto registration, and what was intended to be a MVA change of address card.  It was actually his employee assistance program number for work.  This third card fell inside the car between the driver's seat and door when Underwood was attempting to hand it to the officer through the open

---

[1]At a re-retrial following a hung jury on two counts, he was acquitted of possession of cocaine with the intent to distribute and possession of a firearm during a drug trafficking offense.

driver's window.  Asked to retrieve the card, Underwood "opened the door a little bit, reached down quickly, grabbed the card," and handed it to Corporal Crouch.  This triggered the dome light and the officer realized that Underwood was wearing a jacket, the "two front pockets of [which] were bulging out as if they were packed with something."

Corporal Crouch advised Underwood that he had been doing 58 m.p.h., to which the latter responded that he was traveling downhill.  When asked, Underwood gave his address, that was in Havre de Grace, and advised that he had been living there for two years.  Corporal Crouch, in what he thought might inject some humor into the situation, inquired how long Underwood needed to get used to driving down a hill.  Underwood made no reply. During the conversation, Underwood just sat in the car, looking forward.

The officer returned to his cruiser and ran the tags and license, which were clean.  Because Underwood was making no motions or eye contact, and because of the bulges in his jacket, Corporal Crouch, using his cell phone, accessed Underwood's criminal history.  Underwood "was currently on probation for a possession of a handgun in a vehicle charge."

At this point, Corporal Crouch telephoned the K-9 unit for assistance.  Within two or three minutes, Corporal Cooper, with Digo, responded.  Corporal Cooper said that there should be no occupant in the car when Digo scanned it.  Corporal Crouch asked Underwood to step out of the Cadillac.  The driver said that he did not have to get out of the car for a traffic stop.  Underwood "never moved, he continued to sit with his hands in his lap and was

looking straight forward and not moving." The officer repeated his request, Underwood gave the same response, and did not move.

Corporal Cooper advised using force if necessary to remove Underwood. Corporal Crouch opened the driver's door and reached for Underwood's right hand that was still in his lap. As Corporal Crouch "started to reach for his right hand, [Underwood] started to move towards his right pocket." The officer cuffed the right wrist and began to tug Underwood out of the car. "He never moved until his entire upper body was out of the car, and then he moved his feet to put them underneath of him." Corporal Crouch fully handcuffed him and frisked him.

The bulges in the two pockets of the jacket were gloves. Because of the right hand motion that Underwood had made, the officer patted down the right front pants pocket. As soon as he touched it, he "knew there was a handgun" there, because he could "feel the trigger guard and the slide." It was a loaded .25 caliber handgun with a 2.5 inch barrel. Underwood also had a retractable razor knife in the watch pocket. A search then produced a cigarette pack containing three baggies of crack cocaine in the front left pants pocket, as well as $280 in cash.

The initial traffic stop was made at 10:59 p.m., and Corporal Crouch radioed in to dispatch at 11:11 p.m. that a handgun had been recovered.

Underwood, age twenty-four at the time of the suppression hearing on June 29, 2011, testified without substantially contradicting the State's presentation. He acknowledged on cross-examination that he never offered or agreed to exit the Cadillac voluntarily.

In argument, the State relied on *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). Underwood argued that the bulges in his jacket were insufficient to establish reasonable suspicion, under *Terry*, that he was armed. The court observed that Underwood's "stoic" behavior "and the bulges, led the officer to call the K-9, with a suspicion that there was drugs." The court also observed that it was unique that Underwood "has a possession of a handgun violation, and if that didn't make the officer nervous, with a defendant who's pretty stoic and has bulges in his pockets, I mean, I would probably have been thinking handgun as opposed to drugs." On the totality of the circumstances, the suppression court denied the motion.

Upon Underwood's ultimate convictions, this appeal was noted. Additional facts will be stated as required in the resolution of the arguments.

**Discussion**

Here, it is clear that the traffic stop was lawful. The issue raised by Underwood goes only to the frisk. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion[.]" *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880. Underwood contends that Corporal Crouch testified that his suspicion of a weapon was

- 4 -

limited to the bulges in the jacket pocket. From this he argues that, under *Ransome v. State*, 373 Md. 99, 816 A.2d 901 (2003), bulges alone do not give rise to a reasonable suspicion that the subject is armed. He submits that that holding controls here because *Ransome* also held that the officer's testimony limits the State's argument and our review to the particular ground specified by the officer and that Corporal Crouch limited his ground of suspicion to the jacket bulges. We disagree with Underwood's reading of the record in the instant case and with his claim of a limitational holding in *Ransome*.

In *Ransome*, Officer Moro and two others had been assigned on the night of July 28, 2000 to patrol, in an unmarked police car, an area in Baltimore City that had produced "numerous complaints of narcotics activity, discharging of weapons, and loitering." *Id.* at 101, 816 A.2d at 902. At about 11:20 p.m., they saw Ransome and another man standing on, or walking along, the sidewalk of a deserted street. Ransome had a large bulge in his left front pants pocket which indicated to Moro that Ransome might have a gun. (It was a roll of bills totaling $946.) Two additional factors were

> "(3) the man gazed at the unmarked police car containing three plain-clothed officers as it drove by and slowed to a stop, and (4) when the three officers got out of the car, approached the man, identified themselves as police officers, and one began to ask him questions, the man appeared nervous and avoided eye contact with the officer."

*Id.* at 100, 816 A.2d at 902. The stop and frisk revealed a bag of marijuana in the waistband, ziplock bags, and some cocaine. Moro testified at the suppression hearing that "*based upon the bulge*, I was going to conduct a stop and frisk[.]" *Id.* at 101, 816 A.2d at 902 (emphasis

in original). *Ransome* held that the combination of the neighborhood, the bulge and Ransome's reactions did not amount to reasonable, articulable suspicion.

In the instant case, the short answer to Underwood's contention is that Corporal Crouch did not limit the articulated bases of his suspicions to the bulging jacket pockets. Underwood relies on a single answer by Corporal Crouch when asked, on cross-examination, what concerns he had as he approached the Cadillac to have the driver step out. The witness replied:

> "My concerns were that he was hiding something of an illegal nature, whether it be a weapon or drugs, and the puffy pockets on his jacket were where I thought that, you know, where my concerns were and where my safety concerns were."

The record, however, manifests that Corporal Crouch devoted the greater part of his testimony to describing the extraordinary rigidity that Underwood maintained throughout the incident, which also led the officer to run the criminal background check, producing the prior probation for a gun offense, leading to the request for a K-9 search, the effort to remove Underwood from the car, and his reaching to his right front pants pocket. When Corporal Crouch was asked where he next frisked Underwood after finding the two gloves, the officer testified: "I went to his right front pocket, because that was the motion he was making with his right hand."

In these stop and frisk cases, the reviewing court "must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880 (footnote omitted). And further, "Each case of this sort will, of course,

- 6 -

have to be decided on its own facts." *Id.* at 30, 88 S. Ct. at 1884. *See also Crosby v. State*, 408 Md. 490, 510-11, 970 A.2d 894, 905-06 (2009). *Crosby* cites *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 751 (2002) (rejecting a "divide and conquer" approach); *Bost v. State*, 406 Md. 341, 356, 958 A.2d 356, 365 (2008) (examine the "whole picture"), and *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008) (recommending a "holistic" approach).

Despite this general rule, Underwood asserts that *Ransome* requires that we cabin our review to the above-quoted answer by Corporal Crouch. "Thus, the [*Ransome*] Court held the police to the 'reasonable and articulable' standard mandated by *Terry* by requiring an articulated basis for the stop and considering only that articulated basis – and none other – for objective reasonableness." Appellant's Brief at 10-11. *Ransome* made no such holding. The Court's discussion of what Underwood calls an "articulated basis" was directed to the absence of any facts indicating why the bulge was not innocent but generated reasonable suspicion that Ransome was armed. The Court recognized that the inferences and conclusions drawn by experienced police officers generally are to be respected, but not rubber stamped. It said:

> "We understand that conduct that would seem innocent to an average layperson may properly be regarded as suspicious by a trained or experienced officer, but if the officer seeks to justify a Fourth Amendment intrusion based on that conduct, the officer ordinarily must offer some explanation of why he or she regarded the conduct as suspicious; otherwise, there is no ability to review the officer's action."

*Ransome*, 373 Md. at 111, 816 A.2d at 908. Because the officer did not explain, based on his experience, why the bulge was suspicious, the bulge, considered cumulatively with the other three factors shown by the record in *Ransome*, did not amount to reasonable, articulable suspicion. *Ransome* does not impose the limitation on the consideration of the record that Underwood urges.

Indeed, in *Crosby v. State*, 408 Md. 490, 970 A.2d 894 (2009), the Court parenthetically described *Ransome* as "noting that officer's suspicion was not reasonable where the officer 'never explained why he thought that petitioner's stopping to look at his unmarked car as it slowed down was suspicious or why petitioner's later nervousness or loss of eye contact, as two police officers accosted him on the street, was suspicious.'" *Id.* at 510, 970 A.2d at 905.

Rejecting the blinders that Underwood would impose, we note that the suppression court concluded: "So I think that the real thing that brings it all together is the knowledge of the probationary status for a handgun violation." This conclusion was based on the suppression court's findings, earlier stated by the court:

> "But we do have something in this case that you don't have in other cases, and that is that he has a possession of a handgun violation, and if that didn't make the officer nervous, with a defendant who's pretty stoic and has bulges in his pockets, I mean, I would probably have been thinking handgun as opposed to drugs, and you have the issue of public safety, or officer safety, so he was concerned about a handgun and drugs, and I know that through their training, knowledge and skills they believe that a lot of drug dealers have guns. So in this case, again I refer to the conviction and probation for a handgun violation."

Underwood, implicitly arguing a "divide and conquer" analysis, refers us to 4 LaFave, *Search and Seizure, A Treatise on the Fourth Amendment* § 9.5(a), at 258 (3d ed. 1996), citing *State v. Valentine*, 134 N.J. 536, 547, 636 A.2d 505, 510-11 (1994), for the proposition that a frisk is never justified "solely" on an officer's knowledge of a suspect's criminal history.

LaFave treats *Valentine* as a criminal history case. The defendant there had a lengthy arrest record that included charges for weapons offenses and armed robberies. *Id* at 540, 636 A.2d at 507. In reversing the intermediate appellate court's suppression of a knife seized from Valentine in a frisk, the Supreme Court of New Jersey relied on all the circumstances. It said that "knowledge of a suspect's criminal history, especially where that history involves weapons offenses, is a relevant factor[.]" *Id.* at 547, 636 A.2d at 510. Further, "[i]n many instances, a reasonable inference may be drawn that a suspect is armed and dangerous from the fact that he or she is known to have been armed and dangerous on previous occasions." *Id.* at 548, 636 A.2d at 511.

In his fifth edition, LaFave discusses the basis for initiating a frisk in § 9.6(a). 4 LaFave, *Search and Seizure*, § 9.6(a) (5th ed. 2013). The author points out that in cases of stops for lesser traffic offenses other circumstances than the basis for the stop are required to frisk.

> "Illustrative of the circumstances the courts have deemed sufficient are: ... awareness that the subject had previously been armed[.][91]

_____

"[91] *United States v. Stachowiak*, 521 F.3d 852 (8th Cir. 2008) (reliable informant saw defendant with firearm 2 weeks earlier); *United States v. Adamson*, 441 F.3d 513 (7th Cir. 2006) (frisk justified given 'information about the previous night's incident during which Adamson had brandished a handgun'); *United States v. Strahan*, 984 F.2d 155 (6th Cir. 1993) (informant on earlier occasion reported defendant was wanted in another state and 'was armed'); *Cooper v. State*, 297 Ark. 478, 763 S.W.2d 645 (1989) (defendant's reputation as an often armed drug dealer); *State v. Giltner*, 56 Haw. 374, 537 P.2d 14 (1975); *State v. Dumas*, 786 So. 2d 80 (La. 2001) (stressing officer's 'specific knowledge of defendant's previous association with weapons and with persons carrying weapons'); *State v. Heath*, 299 Mont. 230, 999 P.2d 324 (2000) (defendant caused commotion outside home of woman he had been harassing and who he had earlier threatened with a weapon); *State v. Collins*, 121 Wash. 2d 168, 847 P.2d 919 (1993) ('presence of the ammunition and holster in a vehicle associated with defendant' on prior occasion, 'indicating that defendant might have access to a gun that would fit the holster and use the ammunition,' a factor to be considered). *Cf. State v. Milette*, 727 A.2d 1236 (R.I. 1999) (proper to consider defendant's apparent membership in a organization that has a 'penchant for illegal weapons')."

The Court of Appeals in *Dashiell v. State*, 374 Md. 85, 821 A.2d 372 (2003), has held that officers executing a warrant in a private residence to search for drugs and weapons may frisk persons found on the premises who were not the object of the investigation where the police were reliably informed that weapons were on the premises. In *Faulkner v. State*, 54 Md. App. 113, 119-21, 458 A.2d 81, 84-85 (1983), *aff'd*, 301 Md. 482, 483 A.2d 759 (1984), the stop and frisk was upheld based upon the defendant's conforming to a general description of the person sought for a shooting that occurred on the previous day and upon the defendant's wearing a jacket in mid-September.

Corporal Crouch's knowledge of Underwood's prior handgun offense is a significant factor tending to demonstrate reasonable suspicion.

Further, the officer also relied on Underwood's unusual demeanor, and he fully explained on direct what he considered suspicious.

"Q     And what did you notice about the defendant while he was in the car?

"A     He wasn't making any motions at all.  He wasn't looking to his right, he wasn't looking to his left, he wasn't looking in the rear-view mirror. In 23 years as a police officer, I have never – When I make traffic stops, the persons in the car are always looking around.  They're looking at their watch; how long is this going to take.  They're looking over to the side of [the] road, they're looking at the houses, they've never seen them because they're always driving. They're looking in the rear-view mirror wondering whether I'm going to write them a ticket or I'm going to write them a warning.  They're doing something.  They're moving around in the car.

"Q     And what, if any, concern did that cause you as far as the way he was acting at that point?

"A     It was extremely suspicious."

Here we have a young man who thought he knew the law.  He told the officer that the latter could not order him from the car.[2]  A fair inference from his exaggerated immobility is that he was consciously avoiding any movement that might be claimed to be a furtive motion, knowing that, if he were frisked, he had a handgun and drugs on his person.

In addition, when the officer reached for Underwood's right hand, Underwood, perhaps instinctively, moved it to his right front pants pocket.

Based on all of the circumstances, we hold that Corporal Crouch had reasonable articulable suspicion to frisk.  Underwood alternatively argues that the frisk should have

---

[2]But see *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S. Ct. 330 (1977).

stopped when no weapon was found in the jacket pockets.  That is simply a recycling of the

argument that we have rejected, namely, that the concern for officer safety was limited to the

bulges in the jacket pockets.

**JUDGMENTS OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**
