*Donzel Sellman v. State of Maryland*, No. 84, September Term, 2015.  Opinion by Greene, J.

**CONSTITUTIONAL LAW—FOURTH AMENDMENT—REASONABLE SUSPICION**

On the basis of reasonable suspicion that an individual is armed and dangerous, an officer may conduct a *Terry* frisk.  *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  When reviewing whether reasonable suspicion exists, the test is the totality of the circumstances, viewed through the eyes of a reasonably prudent police officer.  The test is objective.  Reasonable suspicion requires an officer to have specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the frisk.

We hold that, under the totality of the circumstances, the record does not disclose objective facts to support the *Terry* frisk.  The officers conducted a valid traffic stop, but the purpose of that stop was fulfilled once the driver received the written warning.  Having the driver's consent to search the vehicle did not provide Corporal Daughters with the authority to frisk Sellman.  We hold, based on the facts on the record, that reasonable suspicion did not exist to believe Sellman was involved in car break-ins or that he was armed.  It is significant that Corporal Daughters identified several factors, during his testimony, but he failed to explain why those factors made him suspicious that Sellman was armed.  Viewing the facts through an objective lens, the facts are too weak, individually or in the aggregate, to establish reasonable suspicion.  Although the officer expressed a generalized concern about the crime of theft of property from cars, this falls short of the reasonable suspicion standard.  No objective facts support the conclusion that Sellman was involved in criminal activity, and we cannot rationally infer from the facts on the record that a reasonably prudent officer would have had reasonable suspicion to believe that Sellman, or any of the occupants, was armed.

IN THE COURT OF APPEALS

OF MARYLAND

No. 84

September Term, 2015

_____

DONZEL SELLMAN

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Battaglia, Lynne A. (Retired, Specially
Assigned),
Wilner, Alan M. (Retired, Specially
Assigned),

JJ.

_____

Opinion by Greene, J.
Watts and Battaglia, JJ., dissent

_____

Filed: August 24, 2016

In this case, Petitioner, Donzel Sellman ("Sellman"), challenges the denial of a motion to suppress evidence obtained after a *Terry* frisk.[1]  He argues that the law enforcement officers did not have reasonable suspicion to justify the frisk.  We agree that, under the totality of the circumstances, the facts of this case fall short of the reasonable suspicion standard, under *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884, 20 L. Ed. 2d 889, 911 (1968), and therefore, we reverse the judgment of the Court of Special Appeals.

### FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are taken from testimony presented at a suppression hearing, and we view them in a light most favorable to the State, the prevailing party at that hearing.  On November 12, 2013, at approximately 2 a.m., Corporal William Daughters, a twenty-four-year veteran of the Anne Arundel County Police Department, and Officer Dan Kramer, a trainee, were on patrol.  The officers were driving through a large apartment complex in Glen Burnie that contained over fifty buildings and had approximately one thousand residents.  Corporal Daughters indicated that the complex was considered a high crime area, because, in the year that he had been patrolling that area, there had been a shooting, the recovery of handguns, multiple thefts from cars, and drug arrests.

---

[1] On the basis of reasonable suspicion that an individual is armed and dangerous, an officer may conduct a *Terry* frisk.  *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  The frisk "is limited to a pat-down of the outer clothing" and its purpose is "not to discover evidence of a crime, but rather to protect the police officer and bystanders from harm by checking for weapons[.]"  *Bailey v. State*, 412 Md. 349, 368, 987 A.2d 72, 84 (2010).  *See also Derricott v. State*, 327 Md. 582, 587, 611 A.2d 592, 595 (1992) ("[T]he officer may conduct a carefully limited search of the outer clothing of such person in an attempt to discover weapons which might be used to assault the officer.").

As the two officers entered the complex, they observed a vehicle stopping at a stop sign; the driver waited for the officers to cross the intersection before proceeding. As the officers drove through the complex, they observed an individual, later identified as Sellman, walk from a dark area on the side of one of the apartment buildings where there was no entry way towards an area lit by a street light. Corporal Daughters testified that "it appeared we startled him." The officer explained that Sellman "came to an abrupt stop, and then quickly, he started to turn to his right, but then stopped and then watched our car as it went by." Once the officers drove past him, Sellman continued on his way. Corporal Daughters observed Sellman through his rearview mirror, and saw him walk at a normal pace "toward[s] the roadway and [he] walked toward[s] the parking area. There are cars parked along the shoulder on that roadway, and he appeared to be walking towards those cars." He noticed that the vehicle he had previously seen at the stop sign "stopped in the roadway and then the person on foot[, Sellman,] got into the left rear door of the vehicle."

Corporal Daughters later testified: "I just thought it appeared odd at that point, people out on foot and people - - instead of everyone getting into a car in one location, picking somebody up around the corner . . . ."[2] The officers turned the patrol car around,

---

[2] We note Corporal Daughters testified that the only pedestrian he observed was Sellman; he did not testify that he observed multiple individuals entering the vehicle. At the time he saw Sellman entering the car, there were already three occupants inside the vehicle, including the driver. When asked about the condition of pedestrian traffic, at the time he observed this activity, the officer testified: "The vehicle and the subject on foot were the only people that were walking, were out anywhere." When Corporal Daughters pulled the vehicle over, he testified that the driver explained that she had picked up another passenger, Andrea Queen, "from her apartment nearby." He also testified that later, in the encounter, the driver also stated that Sellman lived in the complex and that she had also picked him up.

and followed the vehicle. Upon noticing that the vehicle had a broken rear taillight and a broken tag light dangling by its wiring harness below the bumper, Corporal Daughters activated the emergency lights, and the driver immediately pulled over.

The officers exited the patrol car, and approached the stopped vehicle from different sides. Corporal Daughters approached the driver's side and observed four occupants inside, including Sellman who was in the left-rear passenger seat.[3] Corporal Daughters explained to the driver, Samantha Gillespie, why he had pulled her over, and requested her driver's license and vehicle registration. Gillespie explained that she was unsure where the registration was, because she was borrowing the car from a friend, however, she did provide her driver's license. When asked why she was in the neighborhood, Gillespie explained that she was there to pick up Andrea Queen, a resident who lived in a nearby apartment. Officer Kramer testified: "The driver stated that they were taking her pregnant friend to go out and get some food[.]" Queen was in the right-rear passenger seat opposite the driver. Corporal Daughters asked Queen if she had any identification. She responded no, but indicated that she lived in the complex. Corporal Daughters later testified that he had encountered Queen on a previous occasion, and had reason to believe she did not live at this particular complex.[4] He also testified that Sellman's behavior was unusual, because:

> On my first approach to the vehicle up to the point where I had actually physically asked him questions, where he had to respond to me, Mr. Sellman

---

[3] Both officers were equipped with flashlights, which they used to illuminate the interior of the stopped vehicle. On cross-examination, Corporal Daughters testified that he observed nothing unusual inside.

[4] Corporal Daughters testified "it raised my suspicions a little bit because my understanding was she was living at the address where we had the previous contact with her."

was sitting completely rigid in his seat, he had his hands on his knees and was looking straight ahead and never turned his head once.

The officers returned to the patrol car to conduct a warrant check on Gillespie, which came up negative. They also used the police database to access records from the Motor Vehicle Administration ("MVA") in order to check the status of the driver and the vehicle she was driving; the vehicle was not reported as being stolen. The officers exited the patrol car, and returned to the stopped vehicle. Gillespie was given a written warning and then Corporal Daughters asked her to exit the vehicle. He took her to the rear of the vehicle, identified the broken lights, and told her that they needed to be repaired. At this time, Corporal Daughters asked Gillespie whether she had anything illegal in the car, and she responded no. He asked for permission to search the vehicle. Gillespie asked why, and Corporal Daughters explained "we had some problems in the area with some thefts and some drugs, and that kind of thing." Both officers testified that Gillespie consented to the search.[5] Corporal Daughters then asked Gillespie if the left-rear passenger, Sellman, lived in the apartment complex. She stated yes, and that she had picked him up as well. Gillespie remained with Officer Kramer while Corporal Daughters returned to the stopped car. Corporal Daughters testified that "because of the history surrounding the apartment complex, I wanted to identify everybody in the vehicle." He stated:

---

[5] At the pre-trial suppression hearing, Gillespie's testimony contradicted portions of the testimony given by Corporal Daughters. For example, Gillespie testified that the car was not damaged at the time of the traffic stop, and that she had not given the officers consent to search the vehicle. Officer Kramer, however, corroborated Corporal Daughters' testimony. In her ruling, the motions judge found the officers to be more credible than Gillespie, and found, among other things, that Gillespie had freely and voluntarily consented to the search of the vehicle. Consent is not an issue in this case.

I went back up to the vehicle [to obtain identification from the other occupants]. Again, at that point, I had a somewhat conflicting story about who lived in the apartment complex. The only one that stated they had, was the right-rear passenger, [Queen,] the female.

When asked why this was conflicting, Corporal Daughters testified:

Because now, the driver was saying that the left-rear passenger[, Sellman,] also lived in the apartment complex, yet when I asked the group in the car when I first approached who lived in the apartment complex, the only one that said they did, was the right-rear passenger.

Prior to conducting the search, he asked the three passengers to identify themselves. The front-seat passenger, a male, provided identification. Corporal Daughters testified that Sellman "kept looking straight ahead and never looked at me[,]" however, "[o]nce I actually asked him a question, he turned toward me and gave me the name and date of birth." Queen also provided her name and date of birth. The officer then asked Sellman if he lived in the complex and Sellman replied that he did not, which conflicted with Gillespie's earlier statement.

Officer Kramer remained with Gillespie while Corporal Daughters returned to the patrol car to run warrant checks and a history on the three occupants, including the alias provided by Sellman: Marcus Neal Saunders, born July 12, 1982. While he was running a history on the names using the police database, Corporal Daughters contacted Corporal Miller[6] and asked him to come to the scene to assist, because there were four detainees— two men and two females—and two officers at the scene. He wanted the parking lot checked to see if any cars had been broken into. After running the warrant checks, "[a]ll

---

[6] The record does not contain Corporal Miller's first name.

three came back with no warrants." However, "the name Saunders had absolutely no record through [the] MVA, local arrest records, anything." He testified that this was unusual.[7] He also testified that he was confident in the identity of the other three occupants, because two had provided identification, and he knew the third, Queen, from a previous encounter.

Corporal Miller arrived shortly thereafter and exited his patrol car. Officer Kramer remained with Gillespie at the rear of the stopped vehicle while Corporal Miller approached the vehicle from the right side, and Corporal Daughters approached the vehicle from the left side. Corporal Daughters opened the left rear door, and again questioned Sellman about his name. Sellman replied that he had provided his correct name, and when the officer informed him that no records came up under that name, Sellman explained that "he'[d] never had a driver's license, he'[d] never been arrested, [and] he'[d] never been in trouble." The officer then ordered Sellman out of the vehicle, and had him place his hands on the trunk of the car. Corporal Daughters testified that he conducted the frisk, because:

> At that point, I had again conflicting stories about who had been picked up where, whether anybody at all lived in the apartment complex, if anybody, [and i]t was odd that they were driving through the parking lot, [and Gillespie informed me she was] picking people up on foot at that hour of the morning . . . . And before I continue any further, or continue to a search of the vehicle, which Ms. Gillespie allowed us to do, I wanted to make sure none of the passengers were carrying any weapons.

---

[7] Later, after this encounter, Corporal Daughters would learn that the name provided by Sellman was an alias.

- 6 -

He testified that it was his intent to search the vehicle. At the suppression hearing, the State asked "what is the normal course of procedure or the normal standard operating procedures" prior to conducting a search of a vehicle. Corporal Daughters responded:

> We will take the individuals out of a car . . . have them step out, individually, and make sure that they're not carrying weapons or anything that can harm us . . . once they're out of the car. And then once the car is clear, officers or an officer will stay with the passengers or driver, whoever the occupants of the vehicle are.

He testified that he asked Sellman if he had any weapons on him and Sellman responded no. Then, Corporal Daughters frisked Sellman, pursuant to these standard operating procedures, and discovered a handgun in Sellman's waistband.[8]

Prior to trial, Sellman moved to suppress the evidence obtained from the frisk. He argued that the frisk was unconstitutional, because the officers lacked a reasonable basis to believe Sellman was armed and dangerous. On April 2 and 22, 2014, a pre-trial suppression hearing took place in the Circuit Court for Anne Arundel County. Corporal Daughters testified for the State; Ms. Gillespie testified for the defense; Officer Kramer testified as a rebuttal witness for the State in order to corroborate Corporal Daughters' testimony.

The motions judge denied the motion to suppress, and upheld the frisk of Sellman. The judge found the initial traffic stop was valid, because the vehicle had a broken taillight and tag light, and that Gillespie freely and voluntarily consented to the search the vehicle. She also found credible the officers' description of Sellman: "[H]e appeared to be nervous, how he was rigid, how he was looking ahead." Lastly, the judge found that the pat down

---

[8] A further search of Sellman led to the discovery of cash and controlled dangerous substances, including cocaine, PCP, oxycodone and heroin.

was valid. According to the suppression court, there was reasonable articulable suspicion to frisk Sellman, because the officers "were outnumbered at that point in time; They were in a high-crime area [and] it was late at night; The Defendant had come from a dark area; His [rigid and nervous] behavior in the vehicle led to some suspicion on their part . . . ."

At trial, Sellman entered into a not guilty agreed statement of facts to the charges of possession of cocaine with intent to distribute and possession of a firearm during a drug trafficking crime. He was found guilty on both charges and was sentenced to a total of ten years in prison, the first five to be served without the possibility of parole.

Sellman appealed the constitutionality of the frisk to the Court of Special Appeals. In an unreported opinion, a divided panel of the intermediate appellate court affirmed the denial of the motion to suppress. It held, based on its review of the totality of the circumstances, that the facts created reasonable suspicion that Sellman was armed and dangerous, and that he had committed or was planning to commit a crime. Therefore, it reasoned, it was permissible for Corporal Daughters to frisk Sellman in the interest of officer safety. One judge dissented, and stated: "It is painfully obvious that the officers frisked [] Sellman not because they were acting upon reasonable suspicion that he was armed and dangerous, but because they routinely conduct suspicionless searches of every passenger in every car they search."

Sellman filed a petition for writ of certiorari with this Court. We granted *certiorari* to answer the following questions:

1.  Did the Court of Special Appeals err in finding the police had reasonable suspicion to believe Mr. Sellman was armed and dangerous, simply because

he was stopped for generally suspicious conduct in a high crime area where thefts from cars had been reported at some unspecified time in the past?

2. Did the Court of Special Appeals err in finding that the crime of theft from cars implies the use of a deadly weapon?

*Sellman v. State*, 446 Md. 218, 130 A.3d 507 (2016). For the reasons stated below, we answer the questions in the affirmative. Accordingly, we hold that the evidence seized in violation of the Fourth Amendment was inadmissible. Therefore, we reverse the judgment of the Court of Special Appeals.

## STANDARD OF REVIEW

At issue is the propriety of the denial of a motion to suppress evidence obtained by way of a frisk. We have previously stated:

> When reviewing the disposition of a motion to suppress evidence alleged to have been seized in contravention of the Fourth Amendment . . . ., we view the evidence adduced at the suppression hearing, and the inferences fairly deducible therefrom, in the light most favorable to the party that prevailed on the motion. The appellate court defers to the trial court's fact-finding at the suppression hearing, unless the trial court's findings were clearly erroneous. Nevertheless, in resolving the ultimate question of whether the detention or attendant search of an individual's person or property violates the Fourth Amendment, we make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. Thus, this Court considers the evidence adduced at the suppression hearing, construed in the light most favorable to the State as the prevailing party at the suppression hearing.

*Bailey*, 412 Md. at 362, 987 A.2d at 80 (internal citations and quotation marks omitted).

*See also Nathan v. State*, 370 Md. 648, 659, 805 A.2d 1086, 1093 (2002) ("We will review the legal questions *de novo* and based upon the evidence presented at the suppression hearing and the applicable law, we then make our own constitutional appraisal.") (citation omitted).

## DISCUSSION

Sellman argues that the judgment of the Court of Special Appeals should be reversed, because the facts do not amount to reasonable suspicion to justify a frisk under *Terry*, 392 U.S. at 30, 88 S. Ct. at 1884, 20 L. Ed. 2d at 911. Sellman argues that the record is devoid of any facts indicating he was armed or dangerous, or linking him to the suspected crime of theft of property from cars. He contends that the intermediate appellate court erred in justifying the frisk based on a generalized concern about car break-ins occurring in the area where he was stopped, which falls short of reasonable suspicion. In his brief, Sellman argued: "The [intermediate appellate] court relied on the purportedly violent nature of car break-ins, and the likelihood of weapon use, yet required no nexus between Mr. Sellman and that particular crime." He posits that to affirm the decision "would allow police to automatically frisk anyone who is stopped on reasonable suspicion as long as it takes place in a high crime area where violent crimes occur."

Naturally, the State disputes Sellman's interpretation of Court of Special Appeals' unreported opinion, and argues that the frisk was justified by reasonable suspicion that Sellman was armed and dangerous. For support, the State cites to several cases, including cases from other jurisdictions, where factors, such as the time of night, a location in a high crime area, or a suspect's nervous behavior, supported a *Terry* frisk of a car occupant.

### Fourth Amendment

The Fourth Amendment of the United States Constitution is applicable to the states through the Fourteenth Amendment. *Holt v. State*, 435 Md. 443, 458, 78 A.3d 415, 423 (2013). It guarantees "[t]he right of the people to be secure in their persons, houses, papers,

and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV; *see Lewis v. State*, 398 Md. 349, 361, 920 A.2d 1080, 1087 (2007) ("The Fourth Amendment, however, is not 'a guarantee against all searches and seizures, but only against unreasonable searches and seizures.'") (citation omitted). "[T]he touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Lewis*, 398 Md. at 361, 920 A.2d at 1087 (internal quotation marks and citation omitted). "Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S. Ct. 330, 332, 54 L. Ed. 2d 331, 336 (1977) (internal quotation marks and citation omitted). "In these stop and frisk cases, the reviewing court 'must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.'" *Underwood v. State*, 219 Md. App. 565, 571, 101 A.3d 514, 518 (2014) (quoting *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906).

In the present case, the parties do not dispute the propriety of the initial traffic stop based on minor traffic violations. The purpose of that stop was fulfilled once Gillespie received the written warning from the officers. Then, Gillespie consented to the search of the vehicle. The issue raised is whether, under all of the circumstances, the *Terry* frisk of Sellman was permissible under the Fourth Amendment.[9] Our analysis, therefore, begins and ends with the frisk.

---

[9] The record is silent as to whether the other occupants were also frisked.

- 11 -

**Reasonable Suspicion for a *Terry* Frisk**

"The default rule requires that a seizure of a person by a law enforcement officer must be supported by probable cause, and, absent a showing of probable cause, the seizure violates the Fourth Amendment." *Crosby v. State*, 408 Md. 490, 505, 970 A.2d 894, 902–03 (2009). In *Terry*, however, the Supreme Court of the United States "recognized that a law enforcement officer may conduct a brief investigative 'stop' of an individual if the officer has a reasonable suspicion that criminal activity is afoot." *Crosby*, 408 Md. at 505, 970 A.2d at 903 (citing *Terry*, 392 U.S. at 17, 88 S. Ct. at 878, 20 L. Ed. 2d at 903). *See also In re David S.*, 367 Md. 523, 532, 789 A.2d 607, 612 (2002) ("[A] police officer may stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion, supported by articulable facts, that criminal activity 'may be afoot.'"). "[A]lthough a reasonable stop is a necessary predecessor to a reasonable frisk, a reasonable frisk does not inevitably follow in the wake of every reasonable stop." *Simpler v. State*, 318 Md. 311, 319, 568 A.2d 22, 25–26 (1990) (quoting *Gibbs v. State*, 18 Md. App. 230, 238–39, 306 A.2d 587, 592 (1973)) (internal quotation marks omitted). To safeguard constitutional protections guaranteed by the Fourth Amendment, a frisk following a *Terry* stop is permitted under limited circumstances:

> In addition to the authority to stop and briefly detain a person, the Supreme Court identified circumstances permitting police officers to pat-down the subject of a *Terry* stop:
>
> > "[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that

> the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."
>
> *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. 2d [at 909] (citations omitted). This limited search, known in common parlance as a frisk, "is not to discover evidence, but rather to protect the police officer and bystanders from harm." *State v. Smith*, 345 Md. 460, 465, 693 A.2d 749, 751 (1997).

*In re David S.*, 367 Md. at 533, 789 A.2d at 613. *See also McDowell v. State*, 407 Md. 327, 340, 965 A.2d 877, 884 (2009) ("What *Terry* allows are 'necessary measures' to determine whether a person is carrying a weapon.").

Under *Terry*, in order to conduct a frisk an officer must have reasonable suspicion "that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous . . . ." 392 U.S. at 30, 88 S. Ct. at 1884, 20 L. Ed. 2d at 911; *See also Crosby*, 408 Md. at 508, 970 A.2d at 904 ("[T]he reasonable suspicion standard carries limitations[:] it does not allow [a] law enforcement official to simply assert that innocent conduct was suspicious to him or her.") (internal quotation marks omitted).

When reviewing whether reasonable suspicion exists, "[t]he test is 'the totality of the circumstances,' viewed through the eyes of a reasonable, prudent, police officer." *Bost v. State*, 406 Md. 341, 356, 958 A.2d 356, 365 (2008). The test is objective: "the validity of the stop or the frisk is not determined by the subjective or articulated reasons of the officer; rather, the validity of the stop or frisk is determined by whether the record discloses articulable objective facts to support the stop or frisk." *Ransome v. State*, 373 Md. 99, 115,

816 A.2d 901, 910 (2003) (Raker, J., concurring). Reasonable suspicion requires an officer

to have "specific and articulable facts which, taken together with rational inferences from

those facts, reasonably warrant that intrusion . . . ." *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880,

20 L. Ed. 2d at 906. In other words, "[t]he officer has reason to believe that an individual

is armed and dangerous if a reasonably prudent person, under the circumstances, would

have felt that he was in danger, based on reasonable inferences from particularized facts in

light of the officer's experience." *Bailey*, 412 Md. at 367, 987 A.2d at 83 (citing *Longshore*

*v. State*, 399 Md. 486, 509, 924 A.2d 1129, 1141–42 (2007)).

> In *Crosby*, we dedicated significant time to the subject of reasonable suspicion:
>
> First, reasonable suspicion is a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act. While the level of required suspicion is less than that required by the probable cause standard, reasonable suspicion nevertheless embraces something more than an inchoate and unparticularized suspicion or hunch. Second, a court's determination of whether a law enforcement officer acted with reasonable suspicion must be based on the totality of the circumstances. Thus, the court must . . . not parse out each individual circumstance for separate consideration . . . . In making its assessment, the court should give due deference to the training and experience of the law enforcement officer who engaged the stop at issue. Such deference allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. To be sure, [a] factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer.

408 Md. at 507–08, 970 A.2d at 903–04 (internal quotation marks and citations omitted).

Importantly, "the officer must explain how the observed conduct, when viewed in the

context of all of the other circumstances known to the officer, was indicative of criminal

activity." *Crosby*, 408 Md. at 508, 970 A.2d at 904. Upon reasonable suspicion that an

- 14 -

individual is armed and dangerous, an officer may conduct a *Terry* frisk. The frisk "is limited to a pat-down of the outer clothing" and its purpose is "not to discover evidence of a crime, but rather to protect the police officer and bystanders from harm by checking for weapons[.]" *Bailey*, 412 Md. at 368, 987 A.2d at 84 (citation omitted).

### Unlawful *Terry* Frisk

We are mindful that we view the facts through an objective lens—through the eyes of a reasonably prudent police officer—and we "must look at the 'totality of the circumstances' and not parse out each individual circumstance for separate consideration[.]" *Ransome*, 373 Md. at 104, 816 A.2d at 904. *See also United States v. Arvizu*, 534 U.S. 266, 274–75, 122 S. Ct. 744, 751, 151 L. Ed. 2d 740, 750 (2002) (instructing courts to view the facts under the totality of the circumstances and to not engage in a "divide-and-conquer analysis"). *Terry* requires a fact-specific analysis. 392 U.S. at 30, 88 S. Ct. at 1884, 20 L. Ed. 2d at 911. "A factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer." *Ransome*, 373 Md. at 105, 816 A.2d at 904. In the case *sub judice*, the combination of circumstances does not rise to the level of reasonable suspicion, because there is a lack of "specific and articulable facts." *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906. We hold that, under the totality of the circumstances, the record does not disclose articulable objective facts to support the frisk. *See Terry*, 392 U.S. at 30, 88 S. Ct. at 1884, 20 L. Ed. 2d at 911 (holding, in order to conduct a frisk, an officer must have reasonable suspicion "that criminal activity

may be afoot *and* that the persons with whom he is dealing may be armed and presently dangerous . . . .") (emphasis added).

Pertinent factors in our analysis include: the officers' initial observations of Sellman before he entered the vehicle; the traffic stop occurred late at night in a high crime area; the officers were initially outnumbered four to two, and a third officer quickly arrived upon request; the officers received inconsistent statements about who lived in the complex; the four occupants, including Sellman, were compliant throughout the encounter; Sellman's behavior in the vehicle was characterized as unusual, because he was "sitting completely rigid in his seat, he had his hands on his knees and was looking straight ahead and never turned once" until he was spoken to directly; warrant checks on all the occupants came back negative; Corporal Daughters was unable to locate any MVA records under the name provided by Sellman.

"While there undoubtedly is some risk to the police in every confrontation, *Terry* has never been thought to authorize a protective frisk on the occasion of every authorized stop." *Simpler*, 318 Md. at 321, 568 A.2d at 26. Viewing the facts in a light most favorable to the State, a review of the record in the case before us does not advance beyond an "unparticularized suspicion or 'hunch,'" which is far below the requisite constitutional standard for reasonable suspicion. *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. 2d at 909.

Also pertinent to our analysis is the absence of any testimony from the officers providing individualized, objective reasonable suspicion that Sellman was involved in the crime of theft of property from cars. A generalized concern about theft from cars in the

area is not on par with reasonable suspicion, and, without more, is too weak and attenuated to provide reasonable suspicion that criminal activity was afoot. Neither the motions court nor the appellate court may rubber stamp the unlawful conduct of an officer simply because the officer believed he had a right to engage in that conduct. *Ransome*, 373 Md. at 111, 816 A.2d at 908. We review the evidence *de novo*. *See Nathan*, 370 Md. at 659, 805 A.2d at 1093 ("We review the legal questions *de novo* and based upon the evidence presented at the suppression hearing and the applicable law, we then make our own constitutional appraisal."). Notably, although Corporal Daughters testified about the types of crimes that had occurred in the apartment complex where the stop occurred, those crimes occurred at some unspecified time in the past.[10] There is no indication on the record of any reports of thefts from cars occurring that evening, that week, or even that month. Additionally, the officers did not explain why, based on their observations of Sellman, he was suspected of criminal activity. The officers did not observe furtive gestures, evasive maneuvers, bulges, bags or containers, or any instruments associated with the suspected crime of theft, i.e.,

---

[10] Corporal Daughters's explicit testimony on this point was as follows:

> Q    Well, that immediate area, how long have you worked that immediate area?
>
> A    At that point, a little over a year.
>
> Q    Okay. And based on your experiences in that area within = = starting on November 12 and looking backwards, were there any problems in that area, up to that -- leading up to November 12 --
>
> A    Yes. We've had multiple thefts from autos. We've had a shooting in that complex. We've had handguns recovered from that apartment complex and drug arrests from that apartment complex.

- 17 -

theft of property from cars. The officers also did not explain the significance of receiving inconsistent statements from the passengers about who lived in the complex and how this was related to their suspicion of criminal activity. *See Crosby*, 408 Md. at 508, 970 A.2d at 904 ("[T]he officer must explain how the observed conduct, when viewed in the context of all of the other circumstances known to the officer, was indicative of criminal activity."). *See also Ransome*, 373 Md. at 109, 816 A.2d at 907 (stating that the officer "never explained why he thought that petitioner's stopping to look at his unmarked car as it slowed down was suspicious or why petitioner's later nervousness or loss of eye contact, as two police officers accosted him on the street, was suspicious"). Unlike other cases, which will be discussed below, there is an absence of additional circumstances connecting Sellman to the suspected criminal activity.

We can deduce from the record that the scene where the traffic stop took place was one in which the officers were in control, and did not fear for their safety. Neither officer testified that they were concerned for their safety, and we cannot rationally infer from the facts on the record that a reasonably prudent officer would have had reasonable suspicion to believe that Sellman, or any of the occupants, was armed. Therefore, the officers did not need to frisk Sellman in order to protect themselves or bystanders. *See Bailey*, 412 Md. at 368, 987 A.2d at 84 (stating that a *Terry* frisk "is limited to a pat-down of the outer clothing" and its purpose is "not to discover evidence of a crime, but rather to protect the police officer and bystanders from harm by checking for weapons[.]") (citation omitted). Although the officers were initially outnumbered four to two, throughout the encounter, the occupants—two women and two men—were compliant and responsive to the officers'

questions. During cross-examination, Corporal Daughters described Gillespie as "talkative" and "friendly" and her demeanor as "[n]othing out of the ordinary." There was no testimony that any of the occupants were acting hostile towards the officers. We also note that backup was immediately available upon request. Under the totality of the circumstances, it appears that the true purpose of requesting backup was to gather evidence of criminal activity rather than to alleviate any concerns of being outnumbered. Corporal Daughters testified that he requested an additional officer in order to have that officer check the parking lot for evidence of car break-ins.

When the officers first approached the vehicle, they used their flashlights to illuminate the interior and noticed nothing unusual inside. Their observations of Sellman, prior to and after he entered the vehicle, did not include testimony that he acted furtively, evasively, or that he appeared to be carrying a weapon. Furthermore, the officers were able to establish that none of the four occupants, including Sellman under the alias he provided, was named in an outstanding warrant. Importantly, the fact that no MVA records were found under the alias provided by Sellman is a factor to be considered,[11] but Corporal

---

[11] Reasonable suspicion is the standard required for a *Terry* frisk. We view the facts in the context of the circumstances known to the officer as well as any rational inferences that may be drawn from the record. Any information that comes to the officer's knowledge after the frisk is not relevant to the justification of the antecedent frisk. *See Crosby*, 408 Md. at 508, 970 A.2d at 904 ("[T]he officer must explain how the observed conduct, when viewed in the context of all of the other circumstances known to the officer, was indicative of criminal activity."). *See also Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 1661–62, 134 L. Ed. 2d 911, 919 (1996) ("The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause.").

Daughters never explained why he was not satisfied with Sellman's explanation as to why the police database contained no records under his alias or how this fact contributed to his suspicion that Sellman was involved in car break-ins.[12] At the time of the frisk, the officers had no information that the individual identified as Saunders had a criminal record or was dangerous. Under the totality of the circumstances, the absence of MVA records, without more, does not provide the requisite reasonable suspicion. It is significant that Corporal Daughters identified several factors, but he failed to explain *why* they made him suspicious. When we view the facts through an objective lens, the facts are too weak, individually or in the aggregate, to establish reasonable suspicion. *See Ferris v. State*, 355 Md. 356, 387, 735 A.2d 491, 508 (1999). *See also Crosby*, 408 Md. at 515, 970 A.2d at 908 (stating, pursuant to a *Terry* stop, reasonable suspicion requires "particularized and objective reasons" to support an officer's belief that criminal activity is afoot).

In *Crosby*, we held that a *Terry* stop was unlawful because the officer lacked reasonable suspicion that criminal activity was afoot. 408 Md. at 515, 970 A.2d at 908. An officer in an unmarked vehicle was patrolling through a high crime area late at night, and he stopped a vehicle after observing it "maneuvering in and out of parking spaces in the parking lot of an apartment complex." *Crosby*, 408 Md. at 495–96, 970 A.2d at 896–97. He also testified that the driver was slumped down in the driver's seat. *Crosby*, 408 Md. at 496, 970 A.2d at 897. The officer obtained identification from the driver and the passenger; the licenses were valid, and the warrant check came back negative for both

---

[12] Sellman explained that "he'[d] never had a driver's license, he'[d] never been arrested, [and] he'[d] never been in trouble."

occupants. *Crosby*, 408 Md. at 497–98, 970 A.2d at 898. The officer, however, continued to detain the occupants until a K-9 unit arrived at the scene, because he wanted a canine to scan the vehicle for the presence of narcotics. *Crosby*, 408 Md. at 498, 970 A.2d at 898. We held that the *Terry* stop was unlawful, because the conduct observed by the officer "was, by itself, wholly innocent." *Crosby*, 408 Md. at 515, 970 A.2d at 908. "Without particularized and objective reasons that support a different interpretation of what he observed, viewed in the totality of the circumstances, [the officer]'s belief that criminal activity was afoot amounted to no more than an 'inchoate and unparticularized suspicion or 'hunch.''" *Crosby*, 408 Md. at 515, 970 A.2d at 908 (quoting *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. 2d at 909). We explained:

> Deputy Young testified only that he considered what he observed to be suspicious; **he did not illuminate how his training and experience caused him to believe that what he observed revealed possible criminal activity**. He acknowledged that he did not observe Crosby commit any traffic violations the entire time that he surveilled Crosby's supposedly peculiar driving behavior and route of travel. Despite driving in what Deputy Young identified as a "big loop," Crosby signaled before each turn that he made. Thus, this Court is without an "articulated logic" with which to evaluate objectively the deputy's decision to detain Crosby. As several courts have observed, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.

*Crosby*, 408 Md. at 511–12, 970 A.2d at 906–07 (internal quotation marks and citations omitted) (footnotes omitted) (emphasis added). Like *Crosby*, Corporal Daughters, in the instant case, did not explain why, based on his training and decades of experience, the conduct he observed made him suspicious that Sellman was involved in car break-ins and was likely to be armed.

- 21 -

In *Bailey*, we also held that a *Terry* frisk failed to pass constitutional muster. 412

Md. at 358, 987 A.2d at 78. There, an officer was patrolling a high crime area late at night

and observed Bailey, the petitioner, standing in the shadows on the side of a house. *Bailey*,

412 Md. at 359, 987 A.2d at 78. When questioned by the officer about whether he lived at

that location, Bailey did not respond. *Id.* The officer testified that when he approached

the petitioner, he observed that Bailey's hands were visible and that he had "glossy eyes."

*Bailey*, 412 Md. at 360, 987 A.2d at 79. The officer also detected the odor of ether. *Bailey*,

412 Md. at 359, 987 A.2d at 78. He testified that although the possession of ether is not

unlawful, it is often associated with phencyclidine ("PCP"). *Bailey*, 412 Md. at 359–60,

987 A.2d at 78–79. The officer then frisked Bailey and discovered contraband. We

explained that, under *Terry*, the pat-down was invalid:

> At the suppression hearing, Officer Lewis indicated that he searched the
> petitioner to "[c]heck for weapons," but did not provide any basis for his
> suspicion that the petitioner was armed and dangerous. Officer Lewis did
> not testify as to any factors that would lead to a suspicion that the petitioner
> was carrying a weapon. Further, there are no objective factors in the record
> that indicate that the petitioner was armed and dangerous. Although the
> encounter took place at nighttime, the petitioner was alone and the officer
> "could visibly see his hands," which, presumably because the officer did not
> indicate otherwise, were empty. There is no indication in the record that the
> petitioner made any threatening movements, or any movements at all, nor is
> there any indication that Officer Lewis suspected that the petitioner was
> dealing drugs.

*Bailey*, 412 Md. at 368, 987 A.2d at 83. Similarly, in the instant case, Corporal Daughters

failed to provide any basis to support his belief that Sellman was armed, and no objective

factors could support such a conclusion. For example, the officer did not observe weapons,

bulging pockets, or any furtive movements, such as attempts to reach for a concealed

weapon.  Additionally, the officers did not have information to suggest that Sellman had a history of prior dangerousness or any connection to criminal activity.  As we stated above, the officers' observations of Sellman revealed innocent conduct, and the officers did not provide an objective reason to support their interpretation of that conduct: namely, that Sellman was likely involved in criminal activity or was armed.  Without additional circumstances to support the belief of reasonable suspicion, the frisk of Sellman is invalid.

Another case in which we rejected the State's argument that reasonable suspicion existed is *Ransome*, 373 Md. at 111, 816 A.2d at 908.  Although this case involves the stop of a pedestrian rather than the stop of a vehicle, the analysis is helpful.  *Ransome*, 373 Md. at 101, 816 Md. at 902.  There, officers were patrolling through a high crime neighborhood and observed Ransome, a pedestrian, looking at their unmarked patrol car.  *Id.*  Ransome "had a large bulge in his left front pants pocket, which [Officer] Moro took as an indication that petitioner might have a gun."  *Id*.  The officers exited the patrol car, briefly questioned Ransome, and then frisked him.  *Id*.  The State argued the officers had reasonable suspicion to believe that Ransome was armed and dangerous based on:

> Officer Moro's observation and concern about the bulge in petitioner's left front pocket, . . . that this was a high-crime area from which complaints about drug activity, loitering, and shootings had come, that it was late at night and the lighting was poor, that petitioner gazed upon the police car as it approached the pair but then declined to keep eye contact when confronted by Officer Moro, and that petitioner appeared nervous when the officer briefly questioned him.

*Ransome*, 373 Md. at 105, 816 A.2d at 904.  We rejected the argument that the officer had reasonable suspicion that Ransome was armed:

> [P]etitioner had done nothing to attract police attention other than being on the street with a bulge in his pocket at the same time Officer Moro drove by. He had not committed any obvious offense, he was not lurking behind a residence or found on a day care center porch late at night, was not without identification, was not a known criminal or in company with one, was not reaching for the bulge in his pocket or engaging in any other threatening conduct, did not take evasive action or attempt to flee, and the officer was not alone to face him.

*Ransome*, 373 Md. at 109–10, 816 A.2d at 907. In other words, Officer Moro did not explain, based on his experience, why these factors were suspicious. *See id.* We noted that to hold otherwise would result in the abrogation of the Fourth Amendment.[13] *Id.* Those same concerns are present in the instant case.

The State cites several out-of-state cases for support, but those cases are easily distinguishable.[14] For example, in *United States v. George*, 732 F.3d 296, 304 (4th Cir. 2013), the Fourth Circuit upheld a passenger frisk following a valid traffic stop. Although there are some similarities with the case *sub judice*—the stop occurred at 3:30 a.m. in a high crime area—there are also additional factual circumstances. *Id.* The officer was

---

[13] "If the police can stop and frisk any man found on the street at night in a high-crime area merely because he has a bulge in his pocket, stops to look at an unmarked car containing three un-uniformed men, and then, when those men alight suddenly from the car and approach the citizen, acts nervously, there would, indeed, be little Fourth Amendment protection left for those men who live in or have occasion to visit high-crime areas." *Ransome*, 373 Md. at 111, 816 A.2d at 908.

[14] In our research, we also found cases in other jurisdictions that upheld passenger frisks, however, those cases are also readily distinguishable. *See United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010) (upholding a passenger frisk during an investigatory stop, because the passenger was noncompliant, provided evasive and deceptive responses, displayed furtive gestures and "kept his right hand near and reached for his right coat pocket when he got out of the vehicle"); *Colorado v. Jackson*, 948 P.2d 506, 508 (Colo. 1997) ("[A] furtive gesture by the driver or a passenger of an automobile may give rise to an objectively reasonable belief that the officers may be in danger.").

- 24 -

outnumbered four to one, and the passenger acted suspiciously, ignored "a direct order to put his hands on the headrest in front of him," and "continued not to make eye contact with Officer Roehrig." *George*, 732 F.3d at 300. And "most importantly, [the passenger]'s movements indicated that he may have been carrying a weapon."[15] *George*, 732 F.3d at 301. *See also United States v. Cruz*, 156 F.3d 22, 26 (1st Cir. 1998) (upholding a frisk, in part, due to the "the unexplained commotion among its occupants who outnumbered the police officer five to one").

The State also relies on *United States v. Douglas*, but that case is equally unavailing. 964 F.2d 738 (8th Cir. 1992). In *Douglas*, an officer was patrolling an apartment complex, and observed the appellant "bent over and backing out of the back seat of a car parked in a parking lot of an adjacent [] apartment[.]" *Douglas*, 964 F.2d at 739. The officer observed the appellant closing the door, and instead of going into the apartment building associated with that parking lot, he "walk[ed] down an embankment" towards another complex. *Douglas*, 964 F.2d at 739–40. When questioned, the appellant responded that he was staying at a nearby hotel and that, as he was passing through, he "merely shut a car door he had found open." *Douglas*, 964 F.2d at 740. The Eighth Circuit upheld the frisk that

---

[15] "When Officer Roehrig initially approached the stopped vehicle, George's right hand was on the seat next to his right leg and was concealed by his thigh. When Officer Roehrig ordered George to put his hands on the headrest, George placed his left hand on the headrest, but not his right hand, which he kept next to his thigh. Officer Roehrig had to repeat his order four or five times: 'It was . . . getting to the point that I was getting worried about what he had in his right hand.' As Roehrig explained, he 'didn't know what [George] had in his right hand, [but it] could easily have been a weapon.' Although Officer Roehrig's subjective impressions are not dispositive, we conclude that his concern in this instance was objectively reasonable." *George*, 732 F.3d at 301.

followed the *Terry* stop, because there was reasonable suspicion that criminal activity may be afoot and that he was armed. *Douglas*, 964 F.2d at 740–41. Unlike the instant case, the appellee in *Douglas* was caught in an obviously compromising position that strongly indicated criminal activity. *Douglas*, 964 F.2d at 740. The facts in the instant case are not nearly as incriminating. Corporal Daughters observed Sellman walking from the side of an apartment building towards a roadway, and he saw Sellman enter the car driven by Gillespie.

### Nervousness as a Factor

A factor relied on heavily by the State is Sellman's nervous behavior throughout the encounter. In *Ferris v. State*, we warned "against according too much weight to the State's routine claim that garden variety nervousness accurately indicates complicity in criminal activity: 'This repetitive assertion by the Government in all cases of this kind must be treated with caution.'" 355 Md. at 389, 735 A.2d at 508–09 (quoting *United States v. Millan-Diaz*, 975 F.2d 720, 722 (10th Cir. 1992)).[16] In *Ferris*, after the conclusion of a

---

[16] In *Whitehead v. State*, the Court of Special Appeals discussed nervousness as a factor in the context of probable cause:

> The nervousness, or lack of it, of the driver pulled over by a Maryland State trooper is not sufficient to form the basis of police suspicion that the driver is engaged in the illegal transportation of drugs. There is no earthly way that a police officer can distinguish the nervousness of an ordinary citizen under such circumstance from the nervousness of a criminal who traffics in narcotics. An individual's physiological reaction to a proposed intrusion into his or her privacy cannot establish probable cause or even grounds to suspect. Permitting a citizen's nervousness to be the basis for a finding of probable cause would confer upon the police a degree of discretion not grounded in police expertise, and, moreover, would be totally insusceptible to judicial review.

116 Md. App. 497, 505, 698 A.2d 1115, 1119 (1997) (footnote omitted).

valid traffic stop, we held that the continued detention of the petitioner was unlawful, because "[t]he factual circumstances[, including his nervousness,] . . . fell short of establishing reasonable suspicion that Ferris was involved in criminal activity." 355 Md. at 387, 735 A.2d at 507–08. The facts were not particularized and "could fit 'a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.'" *Ferris*, 355 Md. at 387, 735 A.2d at 508 (quoting *Reid v. Georgia*, 448 U.S. 438, 441, 100 S. Ct. 2752, 2754, 65 L. Ed. 2d 890, 894 (1980)). We characterized "Ferris's unexceptional nervousness" as "too ordinary to suggest criminal activity" and distinguished it from nervousness, which may be described as "dramatic, or in some other way be objectively indicative of criminal activity." *Ferris*, 355 Md. at 389, 735 A.2d at 509 (internal quotation marks and citation omitted). Not unlike *Ferris*, we hold that Sellman's nervousness was not exceptional. Instead, his display of nervousness coupled with his compliance in answering Corporal Daughters' questions and exiting the vehicle when ordered to do so, and the blatant lack of other suspicious circumstances "are too weak, individually or in the aggregate, to justify reasonable suspicion of criminal activity." *Ferris*, 355 Md. at 387, 735 A.2d at 508.

Cases that have upheld frisks based on factors, including nervousness, present circumstances which are markedly different than those in the case *sub judice*. For example, in *Underwood v. State*, the Court of Special Appeals upheld a valid *Terry* frisk, and that situation is readily distinguishable. 219 Md. App. at 575, 101 A.3d at 520. Underwood had been pulled over for speeding, and when the officer approached the vehicle, the

appellant was sitting with "extraordinary rigidity." *Underwood*, 219 Md. App. at 567, 101 A.3d at 516–17 (internal quotation marks omitted). "Underwood was wearing a jacket" and the two front pockets "were bulging out as if they were packed with something." *Underwood*, 219 Md. App. at 567, 101 A.3d at 515. This prompted the officer to run a criminal background check, and he discovered that Underwood had a prior probation for a gun offense. *Underwood*, 219 Md. App. at 570–71, 101 A.3d at 517–18. This further prompted the officer to request a K-9 search. *Id.* Twice he ordered Underwood to exit the vehicle, but he refused to comply. *Underwood*, 219 Md. App. at 568, 101 A.3d at 516.

> Corporal Cooper advised using force if necessary to remove Underwood. Corporal Crouch opened the driver's door and reached for Underwood's right hand that was still in his lap. As Corporal Crouch "started to reach for his right hand, [Underwood] started to move towards his right pocket." The officer cuffed the right wrist and began to tug Underwood out of the car. "He never moved until his entire upper body was out of the car, and then he moved his feet to put them underneath of him." Corporal Crouch fully handcuffed him and frisked him. The bulges in the two pockets of the jacket were gloves. Because of the right hand motion that Underwood had made, the officer patted down the right front pants pocket [and discovered a handgun].

*Id.* The intermediate appellate court held that reasonable suspicion existed to justify the frisk: "A fair inference from his exaggerated immobility is that he was consciously avoiding any movement that might be claimed to be a furtive motion, knowing that, if he were frisked, he had a handgun and drugs on his person." *Underwood*, 219 Md. App. at 575, 101 A.3d at 520. It is important to note that it was Underwood's extraordinary rigidity in conjunction with the other factors that provided reasonable suspicion. This is unlike the instant case. *See also Matoumba v. State*, 162 Md. App. 39, 43, 873 A.2d 386, 388 (2005), *aff'd*, 390 Md. 544, 890 A.2d 288 (2006) (upholding the *Terry* frisk of a passenger, because

"the passenger (1) repeatedly looked back at the police cruiser while the officers were affecting the stop; (2) appeared to dip his right shoulder down toward the floor as [the officer] approached; (3) placed his right hand behind his back as [the officer] actually reached the rear passenger side; (4) maintained constant eye contact with [the officer]; and (5) demonstrated visibly shaking hands when commanded to show them").

*Russell v. State* is also distinguishable. 138 Md. App. 638, 653–54, 773 A.2d 564, 573 (2001). During a valid traffic stop, the officer observed that the passenger "was unusually nervous while looking through his pockets for his license and was attempting to conceal something in a pocket that was large enough to hold a handgun." *Russell*, 138 Md. App. at 653, 773 A.2d at 572. The officer "explained that he had conducted a large number of traffic stops, and that the level of nervousness exhibited by appellant was unusual for a mere passenger." *Russell*, 138 Md. App. at 644–45, 773 A.2d at 568. He also testified that the stop occurred in a high crime area where a "great deal of weapons" have been recovered. *Russell*, 138 Md. App. at 645, 773 A.2d at 568. Lastly, "[h]e observed that the pocket into which appellant pushed something back was large enough to conceal a handgun." *Russell*, 138 Md. App. at 653, 773 A.2d at 572. Thus, the frisk was justified because the factual circumstances supported the belief of reasonable suspicion that the passenger was armed. *Id.*

The State also cites to *Cortes v. Nevada*, 260 P.3d 184, 189 (Nev. 2011) for support, but that case is also unavailing. There, the Nevada Supreme Court upheld the frisk of a passenger. *Id.* When the officer initiated a traffic stop and spoke to the driver, the passenger appeared unusually nervous, acted evasively, had a knife on his lap, refused to

keep his hands in plain view, and, upon exiting the vehicle, tried to conceal his hands and back from the officer. *Cortes*, 230 P.3d at 186. Under these circumstances, a reasonably prudent officer would have reasonable suspicion as well, but the same cannot be said in the instant case. "[T]he reasonable suspicion standard carries limitations; it does not allow [a] law enforcement official to simply assert that innocent conduct was suspicious to him or her." *Crosby*, 408 Md. at 508, 970 A.2d at 904. We shall not "'rubber stamp' conduct simply because the officer believed he had the right to engage in it." *Ransome*, 373 Md. at 111, 816 A.2d at 908.

## Lawfulness of the Institutionalized Police Department Policy

Having addressed the first question presented, we choose now to address separately the lawfulness of the alleged police department policy, which authorizes officers, prior to conducting a consent search of a vehicle, to pat down the occupants of the car. We do not dispute that as a matter of safety it may be reasonable to order the occupants to exit the vehicle. However, where reasonable suspicion that the occupant(s) is armed and dangerous is absent, the frisk of an occupant is an unreasonable intrusion on Fourth Amendment protections. This pernicious institutionalized procedure is unlawful and is counter to *Terry* and its progeny.[17]

---

[17] *See* Dept. of Justice, Civil Rights Div., Investigation of the Baltimore City Police Department (2016), online at https://www.justice.gov/opa/file/883366/download; Dept. of Justice, Civil Rights Div., Investigation of the Ferguson Police Department (2015), online at https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report.pdf; Dept. of Justice, Civil Rights Div., Investigation of the New Orleans Police Department (2011), online at

We addressed this issue *in Simpler* where the officer testified that he carried out a frisk as "a matter of routine caution." 318 Md. at 321–22, 568 A.2d at 27. This echoes Corporal Daughters' testimony, in the case at bar, that, pursuant to receiving consent to search a vehicle, it is normal operating procedure to frisk the occupants. **In *Simpler*, we rejected the assertion that an officer could conduct a pat-down of a person as "a matter of routine caution":**

> The circuit judge at the suppression hearing did not seem to sustain the frisk based on the evidence that Simpler had previously carried a carpet knife. Rather, the circuit judge found that it was "normal for the officer to patdown those who were there . . . ." This finding does not distinguish between the patdowns of Simpler and of the underage males. The finding echoes [Officer] Wassmer's testimony that the patdowns were "a matter of routine caution." **Underlying the testimony and the finding is the notion that any lawful stop justifies a frisk. As we have seen above, that is not the law.** Rather, the burden was on the State at the suppression hearing to demonstrate that the seizure fell within one of the well-delineated exceptions to the warrant requirement. *See State v. Wilson*, 279 Md. 189, 194, 367 A.2d 1223, 1227 (1977). This the State failed to do.

318 Md. at 321–22, 568 A.2d at 27 (emphasis added). We reiterate: "While there undoubtedly is some risk to the police in every confrontation, *Terry* has never been thought to authorize a protective frisk on the occasion of every authorized stop." *Simpler*, 318 Md. at 321, 568 A.2d at 26–27. "[B]efore an officer 'places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so[.]'" *United States v. Powell*, 666 F.3d 180, 185 (4th Cir. 2011) (quoting *Sibron v. New York*, 392 U.S. 40, 64, 88 S. Ct. 1889, 1903, 20 L. Ed. 2d 917, 935 (1968)). "To justify a

---

https://www.justice.gov/sites/default/files/crt/legacy/2014/07/22/newark_findings_7-22-14.pdf.

- 31 -

patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327, 129 S. Ct. 781, 784, 172 L. Ed. 2d 694, 700 (2009).

**Inferring Weapons Use**

The second issue before this Court is whether the Court of Special Appeals erred in finding that the crime of theft from cars implies the use of a deadly weapon. We have previously recognized that "[t]he suspected criminal activity itself can furnish the dangerousness justifying a frisk following a *Terry* stop." *Simpler*, 318 Md. at 318, 568 A.2d at 25. In *Simpler*, for example, we held that the *Terry* frisk following a stop for suspected underage drinking was unlawful, because the facts did not establish reasonable suspicion that the suspect was armed or dangerous. 318 Md. at 312, 568 A.2d at 22. The suspected crime was a minor offense to which we refused to infer weapons use:

> While there undoubtedly is some risk to the police in every confrontation, *Terry* has never been thought to authorize a protective frisk on the occasion of every authorized stop. The very minor offense authorizing the stop here cannot, in and of itself, justify the frisk. To so hold would mean that every motorist issued a citation for a minor traffic offense would enjoy no constitutional protection from a protective search for weapons.

*Simpler*, 318 Md. at 321, 568 A.2d at 26–27.

In *Simpler*, we cited to a compilation of cases found in LaFave's treatise on the Fourth Amendment for its helpful discussion on the propensity of weapons use associated

with particular crimes.  318 Md. at 319, 568 A.2d at 26 (citing WAYNE R. LAFAVE, SEARCH

AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.4(a), at 505–06 (1987)).

Many jurisdictions have held that particular crimes, such as crimes of violence, justify a

*Terry* frisk because the crime itself implies weapons use, and therefore, provides

reasonable suspicion that a suspect is armed and dangerous:

> [I]n some cases the right to conduct a protective search must follow directly from the right to stop the suspect.  The Court seems to take this view in *Terry*, although Justice Harlan's concurring opinion proceeds to "make explicit what I think is implicit" in the majority opinion, namely, that "the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence."  Lower courts have been inclined to view the right to frisk as being "automatic" whenever the suspect has been stopped upon the suspicion that he has committed, was committing, or was about to commit a type of crime for which the offender would likely be armed, whether the weapon would be used to actually commit the crime, to escape if the scheme went awry, or for protection against the victim or others involved.  This includes such suspected offenses as robbery, burglary, rape, assault with weapons, car theft, homicide, and dealing in large quantities of narcotics[.]

WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT

§ 9.6(a) 853–54 (5th ed. 2012) (footnotes omitted).  We agree with LaFave that minor

crimes do not, in and of themselves, justify a *Terry* frisk *without additional circumstances*

that establish reasonable suspicion that a suspect is armed and dangerous.  We repeat here

that "[w]hile there undoubtedly is some risk to the police in every confrontation, *Terry* has

never been thought to authorize a protective frisk on the occasion of every authorized stop."

*Simpler*, 318 Md. at 321, 568 A.2d at 26.  "Other circumstances" must be present to provide

the basis for reasonable suspicion that a suspect is armed and dangerous.

> **But for other types of crimes,** such as trafficking in small quantities of narcotics, possession of marijuana, illegal possession of liquor, prostitution,

- 33 -

bookmaking, shoplifting and other theft, passing bad checks, underage drinking, driving under the influence and lesser traffic offenses, minor assault without weapons, curfew information, or vagrancy, as well as when the stop is for a legitimate noncriminal reason, or when the officer's duties otherwise necessitate his being in close proximity to the individual, **there must be, as Justice Harlan noted in** *Terry***, "other circumstances" present.** Illustrative of the circumstances the courts have deemed sufficient are: the suspect's admission he is armed; a characteristic bulge in the suspect's clothing; an otherwise inexplicable sudden movement toward a pocket or other place where a weapon could be concealed; movement under a jacket or shirt "consistent with the adjustment of a concealed firearm"; an otherwise inexplicable failure to remove a hand from a pocket; awkward movements manifesting an apparent effort to conceal something under his jacket; backing away by the suspect under circumstances suggesting he was moving back to give himself time and space to draw a weapon; awareness that the suspect had previously been engaged in serious criminal conduct (but not more ambiguous "record" information); awareness that the suspect had previously been armed; awareness of recent erratic and aggressive conduct by the suspect; discovery of a weapon in the suspect's possession; discovery that the suspect is wearing a bullet proof vest as to which he makes evasive denials; and awareness of circumstances which might prompt the suspect to take defense action because of a misunderstanding of the officer's authority or purpose.

WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.6(a) 855–62 (5th ed. 2012) (footnotes omitted) (emphasis added). As we have already explained above, there is a dearth of "additional circumstances" to justify a *Terry* frisk, in the case *sub judice*. The crime of theft of property from a vehicle can be a major or minor offense, depending upon the value of the goods taken. It is not a crime of violence or one in which we can say places the police officer in a potentially dangerous situation, absent other circumstances. As LaFave explains:

The cases which have upheld frisks incident to a temporary arrest while a ticket or notice to appear was prepared have usually involved contacts occurring during the hours of darkness, though it is to be doubted that this fact alone will justify a frisk. **Usually there is something more causing the officer to conclude that he is in a potentially dangerous situation**, such

as: that the person has made a sudden and otherwise inexplicable move toward a pocket or other place where a weapon might be concealed; that the person failed to respond to the officer's directive that he stop his vehicle or that he keep his hands in view or remove his hands from his pocket; that there is a characteristic bulge in the person's clothing; that the person stopped displayed a "boisterous, aggressive" attitude, that the officer had previously obtained information that this person carried a weapon; that the officer saw a weapon or holster in the person's car; or that in addition to the minor offense there is some reason also to suspect the individual of much more serious criminal conduct. Also relevant is the fact that the officer is outnumbered.

WAYNE R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT §

9.6(a) 865–68 (5th ed. 2012) (footnotes omitted) (emphasis added). As a matter of policy,

we decline the opportunity to create a bright line rule, and we will not presume that when

an officer has reasonable suspicion that an individual is involved with the crime of theft of

property from cars, the officer may automatically infer that individual is also armed. When

reviewing whether reasonable suspicion exists, "[t]he test is 'the totality of the

circumstances,' viewed through the eyes of a reasonable, prudent, police officer." *Bost*,

406 Md. at 356, 958 A.2d at 365. "The officer has reason to believe that an individual is

armed and dangerous if a reasonably prudent person, under the circumstances, would have

felt that he was in danger, based on reasonable inferences from particularized facts in light

of the officer's experience." *Bailey*, 412 Md. at 367, 987 A.2d at 83 (citing *Longshore*,

399 Md. at 509, 924 A.2d at 1141–42).

**Conclusion**

Accordingly, we hold that, under the totality of the circumstances, Corporal

Daughters did not have reasonable articulable suspicion to frisk Sellman. The evidence

should have been suppressed.  Therefore, we reverse the judgment of the Court of Special

Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY. RESPONDENT TO PAY THE COSTS.**

Circuit Court for Anne Arundel County
Case No. 02-K-13-002427

Argued: May 9, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 84

September Term, 2015

_____

DONZEL SELLMAN

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Wilner, Alan M. (Retired,
Specially Assigned)
Battaglia, Lynne A. (Retired,
Specially Assigned),

JJ.

_____

Dissenting Opinion by Watts, J., which
Battaglia, J., joins

_____

Filed: August 24, 2016

Respectfully, I dissent.  Upon review of the facts and circumstances of this case and the relevant case law governing Terry[1] frisks, I would affirm the decision of the Court of Special Appeals, affirming the Circuit Court for Anne Arundel County's ("the circuit court's") denial of the motion to suppress, and hold that law enforcement officers had reasonable articulable suspicion to frisk Donzel Sellman ("Sellman"), Petitioner.  The resolution of this case does not augment or enhance existing stop-and-frisk case law.  It demonstrates only a disagreement between the Majority and the Court of Special Appeals and the circuit court as to the analysis of the facts of the case under existing case law.  I would hold that the circuit court and the Court of Special Appeals properly applied the law to the facts, and reached the correct result.  Because the evaluation of any Terry frisk— and, particularly this one—is fact-dependent, the facts underlying the case are set forth in detail below.  As with the Majority opinion, the facts are derived from the suppression hearing that the circuit court conducted.

During the hearing on the motion to suppress, Corporal William Daughters ("Corporal Daughters"), a twenty-four-year veteran of the Anne Arundel County Police Department, testified to the following sequence of events.  On November 12, 2013, at approximately 1:49 a.m., Corporal Daughters and Officer Daniel Kramer ("Officer Kramer") (collectively, "the officers"), a recruit trainee, were patrolling the Villages at Marley Station apartment complex in Glen Burnie.  Corporal Daughters testified that there had been multiple thefts from vehicles, drug arrests, illegal handgun possessions, and a

---

[1] Terry v. Ohio, 392 U.S. 1 (1968).

shooting at the apartment complex. During the course of the patrol, Corporal Daughters observed Sellman emerge from a "dark area on the side of" an apartment building where there was no entrance. According to Corporal Daughters, Sellman came to an abrupt stop and seemed startled when he noticed the officers' marked law enforcement vehicle. Sellman quickly turned to the right and stopped again, watching the patrol vehicle as it passed. Sellman then resumed a normal pace and proceeded toward the roadway. Shortly thereafter, Corporal Daughters observed Sellman get into a vehicle that had pulled up next to Sellman on the roadway. The officers followed the vehicle and noticed that it had a broken rear-right tail light lens and that the tag light was hanging from a wire below the bumper. Corporal Daughters activated the patrol vehicle's emergency lights and pulled the vehicle over.

Corporal Daughters told the driver of the vehicle, Samantha Gillespie ("Gillespie"), that he had pulled her over due to the broken tail light lens and tag light. Upon shining his flashlight into the vehicle, Corporal Daughters noted a total of four individuals, including Sellman, who was seated in the left-rear passenger seat. Corporal Daughters asked if anyone in the vehicle lived in the Villages at Marley Station apartment complex, and only a female passenger, Andrea Queen ("Queen"), answered affirmatively. Sellman did not respond. Corporal Daughters asked Gillespie if there were "any guns, bombs, weapons, dead bodies" in the vehicle, and she answered "no." Corporal Daughters then asked if they could search the vehicle, and, according to the officers, Gillespie answered, "I don't care." As Corporal Daughters started to approach the vehicle, Gillespie asked, "Why do you want to search the vehicle?" Corporal Daughters responded that they "had some problems in

the area with some thefts and some drugs" and Gillespie answered that she understood.

Before conducting the search, Corporal Daughters asked Gillespie whether Sellman also lived in the Villages at Marley Station apartment complex, and she answered affirmatively. Corporal Daughters testified that, because of the inconsistencies regarding who actually lived in the apartment complex and "the history surrounding the apartment complex, [he] wanted to identify everyone in the vehicle." Corporal Daughters returned to the vehicle and asked for identification from the remaining three passengers. One male passenger, Donald Harris, had a State-issued identification card, but Queen said that she did not have identification. Corporal Daughters testified that, throughout the stop, Sellman sat rigidly in his seat and looked straight ahead. When Corporal Daughters asked for his information, Sellman turned toward Corporal Daughters and provided the name "Marcus Neal Saunders" and a date of birth of July 12, 1982. A warrant search of all of the passengers came up negative, but the officers could not find a "Marcus Neal Saunders" in the database.

While the warrant checks were processing, Corporal Daughters requested that another officer, Officer Miller, join him and Officer Kramer at the stop. Corporal Daughters testified that he asked Officer Miller to come because there were four people in the car and only two officers. Additionally, Corporal Daughters testified that he wanted to check the parking lot where the vehicle had been to see if any vehicles had been broken into. Once Officer Miller arrived, he and Corporal Daughters approached the vehicle, and Corporal Daughters asked Sellman whether he had given Corporal Daughters the correct name, explaining that "something should come back" when the officers put his name into

their database. Sellman replied that he had provided the correct name and that he must not be showing up in the database because he had never been arrested and had never had a driver's license.

Corporal Daughters asked Sellman to step out of the vehicle and place his hands on the trunk. During Corporal Daughters's testimony, the following exchange occurred:

[PROSECUTOR:] . . . [W]hat did you tell [Sellman]?

[CORPORAL DAUGHTERS:] I had him step out of the vehicle and asked him to place his hands on the trunk of the car.

[PROSECUTOR:] And why did you do that?

[CORPORAL DAUGHTERS:] At that point, I had again conflicting stories about who had been picked up where, whether anybody at all lived in the apartment complex, if anybody. It was odd that they were driving through the parking lot, picking people up on foot at that hour of the morning.

[PROSECUTOR:] Right.

[CORPORAL DAUGHTERS:] And before I continue any further, or continue to a search of the vehicle, which Ms. Gillespie allowed us to do, I wanted to make sure none of the passengers were carrying any weapons.

Corporal Daughters testified that, as he conducted the Terry frisk of Sellman, he felt the impression of a gun where Sellman's belt buckle would be. Corporal Daughters removed a semiautomatic handgun from Sellman's waistband. A subsequent search revealed drugs, including cocaine, on Sellman's person. Officer Kramer, who was no longer a law enforcement officer at the time of the hearing on the motion to suppress, testified at the hearing and concurred with Corporal Daughters's description of the events as they occurred on November 12, 2013.

- 4 -

During the hearing on the motion to suppress, Gillespie disputed much of Corporal Daughters's testimony. Gillespie testified that the damage to the vehicle was barely visible and that the officers had to crouch down to show her what needed to be repaired. Gillespie characterized the Corporal Daughters's behavior toward the occupants of the vehicle as "pretty mean[,]" and she testified that she unequivocally told the officers "no" when they asked to search the vehicle. Gillespie also testified that warrant check took approximately twenty minutes, which conflicted with Corporal Daughters's and Officer Kramer's testimony at the hearing.[2]

The circuit court found that the frisk of Sellman was valid for the following reasons: (1) the passengers in the car outnumbered the officers; (2) the stop occurred late at night in a high-crime area; (3) the officers observed Sellman coming from a dark area; (4) the officers became suspicious of Sellman based on his behavior in the vehicle; and (5) the officers "had a reasonable articulable suspicion at that point to do the [frisk]" of Sellman. Additionally, the circuit court found that the length of the stop was valid because Gillespie consented.

Sellman noted an appeal, and in an unreported opinion, the Court of Special Appeals affirmed the circuit court's denial of the motion to suppress. Specifically, the Court of

---

[2] Corporal Daughters and Officer Kramer did not testify as to the length of the overall stop. Rather, the officers testified that each component of the stop occurred quickly. For example, Corporal Daughters testified that explaining the reason for the stop to Gillespie took between thirty seconds and one minute, and running Gillespie's identification through the database took five minutes. At the hearing, the prosecutor estimated that between eight and ten minutes passed during the traffic stop prior to the frisk.

Special Appeals determined that Sellman's suspicious behavior, combined with his presence late at night in a high-crime area, was "sufficient to arouse reasonable suspicion, in the eyes of an experienced law enforcement officer, that [Sellman] had committed or was planning to commit a crime." The Court of Special Appeals also remarked that Corporal Daughters's "concern that [Sellman] had broken into cars supported a reasonable suspicion that he was armed."

In the instant case, I would hold that Corporal Daughters had reasonable articulable suspicion to believe that criminal activity may have been afoot and to believe that Sellman may have been armed and dangerous. In evaluating whether a frisk of an individual is warranted, the Court must balance "the need to search (or seize) against the invasion which the search (or seizure) entails." Terry v. Ohio, 392 U.S. 1, 21 (1968) (citation and internal quotation mark omitted). As the Supreme Court has explained, "in justifying the particular intrusion the [law enforcement] officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches[.]" Id. at 21-22 (footnote omitted). Considering the totality of the circumstances, I would conclude that the following factors establish sufficient reasonable articulable suspicion to support denial of the motion to suppress: (1) the stop occurred late at night in a high-crime area; (2) specifically, Corporal Daughters testified that there had been multiple thefts from vehicles, a shooting, illegal handgun possessions, and drug arrests at the apartment complex; (3) Sellman behaved nervously before and during the stop; (4) specifically, Sellman came out

- 6 -

of the darkened area of the apartment complex, made evasive movements upon seeing the law enforcement vehicle, and behaved nervously within the vehicle during the stop; (5) Gillepsie advised that Sellman lived at the apartment complex, while Sellman did not respond when Corporal Daughters asked if anyone in the vehicle lived at the apartment complex; and (6) Sellman provided false identification to Corporal Daughters.

As the Supreme Court has incisively observed, "traffic stops are especially fraught with danger to [law enforcement] officers." Arizona v. Johnson, 555 U.S. 323, 330 (2009). Indeed, "the risk of a violent encounter in a traffic-stop setting stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." Id. at 331 (citation and internal quotation marks omitted). In considering potential risks to officer safety, I would agree with the circuit court that the area in which this stop occurred is a salient factor in assessing the "whole picture." Stokes v. State, 362 Md. 407, 416, 765 A.2d 612, 616 (2001) (citation and internal quotation marks omitted). As noted above, when, as in this case, a stop occurs in a high-crime area, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Henson v. United States, 55 A.3d 859, 867-68 (D.C. 2012) (citation and internal quotation marks omitted). Indeed, Corporal Daughters testified that there had been a shooting and other weapon and drug-related offenses at the apartment complex. Thus, the possibility of encountering an armed and potentially dangerous individual was a present concern at the time of the stop.

Turning to Sellman's behavior, in light of the testimony at the suppression hearing, I would conclude that Sellman exhibited nervousness, both prior to and during the course of the stop—certainly behavior that contributed to the establishment of reasonable articulable suspicion for the frisk. In so concluding, I would not grant greater weight to nervousness as a factor in a totality of the circumstances analysis than this Court has previously. Rather, consistent with prior holdings, I would note that nervousness alone is not dispositive in a determination of reasonable suspicion; however, persistent nervousness is a factor that this Court should consider as part of the totality of the circumstances. See United States v. Simpson, 609 F.3d 1140, 1148 (10th Cir. 2010) ("Extreme and persistent nervousness, however, is entitled to somewhat more weight." (Citations and internal quotation marks omitted)).

Although Sellman was not shaking like the defendant in Simpson, id. at 1145, he exhibited nervous and evasive behavior prior to and during the stop. Corporal Daughters testified that when the officers first observed Sellman step out from the shadows of the apartment complex, Sellman stopped, quickly changed course, and then stopped again after seeing the marked law enforcement vehicle. Sellman's reaction to the law enforcement vehicle was made more suspicious by his emergence from a dark area of the apartment complex where there was no entrance. As with many factors that the Court considers as part of the totality of the circumstances, an individual's presence in a dark area alone does not give rise to the suspicion that they are armed and dangerous. See Bailey v. State, 412 Md. 349, 368, 987 A.2d 72, 83 (2010) ("Although the encounter took place at nighttime, the [defendant] was alone and the officer 'could visibly see his hands,' which, presumably

because the officer did not indicate otherwise, were empty."). This Court has, however, noted that it will consider such factors as part of the totality of the circumstances. Indeed, in Ransome v. State, 373 Md. 99, 110, 816 A.2d 901, 907 (2003), this Court explained that we consider whether an individual appears to be hiding or "lurking" in a dark area as a factor when determining whether an officer had reasonable suspicion to believe the individual was armed and dangerous.[3] In this case, Sellman's nervous behavior immediately after emerging from a dark side of a building where there was no entrance is a pertinent consideration in the analysis.

---

[3]In his brief, Sellman contends that this Court's decision in Ransome should guide the analysis in this case. I would disagree. Indeed, the present case is distinguishable from Ransome in that Sellman's behavior (acting nervously toward the law enforcement officers after emerging from a dark area) was unusual. Although, in Ransome, 373 Md. at 109-10, 105, 816 A.2d at 907, 104, this Court held that the defendant's nervousness, presence in a high-crime area, and appearance of having a bulge in his pocket did not establish reasonable suspicion that the individual was armed and dangerous, this Court specifically explained that the defendant was doing nothing unusual at the time the officers approached him:

> Unlike the defendants in the cited cases, or indeed in *Terry*, [the defendant] had done nothing to attract [the law enforcement officers'] attention other than being on the street with a bulge in his pocket at the same time [a law enforcement officer] drove by. He had not committed any obvious offense, **he was not lurking behind a residence or found on a day care center porch late at night, was not without identification**, was not a known criminal or in company with one, was not reaching for the bulge in his pocket or engaging in any other threatening conduct, did not take evasive action or attempt to flee, and the officer was not alone to face him.

(Emphasis added).
    By contrast, in this case, Sellman emerged from a dark area without an entrance outside a building of an apartment complex that was known to the law enforcement officers for violence and drug-related crime. He acted nervously as the officers passed by in the marked vehicle and, importantly, he subsequently provided a false name when questioned during the stop. Unlike the defendant in Ransome, Sellman's behavior was sufficiently unusual to establish reasonable suspicion that he could present a danger to the officers.

- 9 -

Sellman's behavior during the stop also bears on the determination as to reasonable suspicion for the frisk. Corporal Daughters testified that, throughout the course of the stop, Sellman sat "completely rigid in his seat, he had his hands on his knees and was looking straight ahead and never turned his head once." Corporal Daughters indicated that this behavior was unusual. In assessing whether an individual's nervousness is beyond the usual level, the United States Court of Appeals for the Tenth Circuit has credited the opinion of the law enforcement officers who observed the nervous behavior. See Simpson, 609 F.3d at 1148 (The law enforcement officer "did not merely assert that [the defendant] was nervous, he provided a basis for that conclusion—[the defendant] was shaking uncontrollably throughout the entire encounter, even when assured he would not get a ticket. . . . [W]e credit as a factor towards reasonable suspicion, albeit cautiously, [the defendant]'s manifestation of extreme nervousness."). In this case, the circuit court found Corporal Daughters's testimony credible, and, as such, Corporal Daughters's characterization of Sellman's nervousness as unusual is a relevant factor to be considered in determining the existence of reasonable suspicion.

Of particular significance in the present case is Sellman's provision of false identification to Corporal Daughters. Indeed, the circumstances of this case closely mirror those in cases in which other courts have determined reasonable suspicion existed based partially on the provision of false identification. See, e.g., United States v. Richmond, 641 F.3d 260, 261 (7th Cir. 2011) (During a conversation with a law enforcement officer, "[a]fter [the defendant] denied having any identification on him, [the officer] asked [the defendant] his name. . . . [the defendant] lied. A database search through the squad car's

mobile computer reported 'no record on file,' which [the officer] knew to be particularly unusual and potentially indicative of a false name."). Here, when the officers ran the name and date of birth that Sellman provided through the database, no information came back, "as if [the name] [did not] exist." I would agree with the United States Court of Appeals for the Seventh Circuit that an individual's provision of false identification bears on considerations of officer safety. See Richmond, 641 F.3d at 262 ("The 'no record on file' report generated by the pseudonym indicated that [the defendant] might have been trying to hide information." (Citation omitted)). Indeed, such circumstances rightfully raise a law enforcement officer's suspicion that the individual with whom he or she is speaking might have a "dangerous reaction to confrontation[.]" Id.

This case is distinguishable from United States v. Powell, 666 F.3d 180, 185, 189 (4th Cir. 2011), in which the United States Court of Appeals for the Fourth Circuit held that an individual's provision of inconsistent information regarding the validity of his license did not establish reasonable suspicion that he was armed and dangerous. Unlike Sellman, the defendant in Powell, id. at 184, did not display any nervous or evasive behavior and was very forthcoming with the law enforcement officers. Furthermore, the defendant in Powell, id. at 189, did not attempt to give a false name, and the Fourth Circuit expressed doubt that his claim as to the validity of the license was itself suspicious. By contrast, it is not in dispute that Sellman provided the name "Marcus Neal Saunders" to Corporal Daughters when asked for his name. Even after Corporal Daughters informed Sellman that the name returned no information in the database, Sellman insisted that he had given the correct name, further heightening Corporal Daughters's suspicion. Thus, the

- 11 -

circumstances of the present case are distinguishable from Powell, as the defendant in

Powell did not provide a false name to law enforcement officers, did not continue to insist

that the name was accurate after a database search, and did not appear nervous before and

during the course of the stop.

In its unreported opinion, the Court of Special Appeals explained that Corporal

Daughters had reasonable articulable suspicion to believe that Sellman was involved with

criminal activity:

> The totality of these circumstances, viewed in the light most favorable to the State, was sufficient to arouse reasonable suspicion, in the eyes of an experienced law enforcement officer, that [Sellman] had committed or was planning to commit a crime.  Indeed, Corporal Daughters asked another officer to check the parking lot, in the area where there had been thefts from cars, to see if any cars had been broken into.  The concern that [Sellman] had broken into cars supported a reasonable suspicion that he was armed.

(Citations omitted).  Before this Court, Sellman contends in the alternative that, even if this

Court finds that the officers had reasonable articulable suspicion to believe that he had

committed theft from a vehicle, such a crime does not presume the use of a weapon.

Whether theft from a vehicle is a crime that could be presumed to involve the use

of a weapon appears to be a matter of first impression for this Court.[4]  The issue has not

---

[4]As to the issue of crime that occurred in the apartment complex, the majority opinion minimizes the significance of Corporal Daughters's testimony that crimes occurred in the apartment complex in the time period leading up to November 12, the date of Sellman's frisk.  The majority opinion states that Corporal Daughters testified about crime that had occurred in the apartment complex and that those crimes occurred "at some unspecified time in the past."  Maj. Slip Op. at 17.  The majority opinion further states: "There is no indication on the record of any reports of thefts from cars occurring that evening, that week, or even that month."  Maj. Slip Op. at 17.  But concerning crime in the apartment complex, the record reflects that Corporal Daughters was asked: "[S]tarting on

been thoroughly explored by other jurisdictions. The Majority declines to take a position with respect to the presumption of the use of a weapon, and reiterates that a determination of reasonable suspicion depends on the totality of the circumstances. See Maj. Slip Op. at 35. In declining to take a position, the Majority necessarily refrains from establishing new precedent.

A review of case law suggests, however, that theft from a car could be presumed to entail the use of a weapon or tools that could present a danger to law enforcement officers. Indeed, it has been established that individuals have been known to utilize potentially dangerous instruments, such as screwdrivers, in perpetrating thefts from vehicles. See United States v. Williams, 525 F. App'x 330, 331 (6th Cir. 2013) (Law enforcement officers identified "common automobile 'burglary tools'—gloves, a flashlight, and a screwdriver—in plain view near [the defendant's] seat."). In Anderson v. State, 328 Md. 426, 440, 614 A.2d 963, 969 (1992), this Court noted that whether items that are not legislatively deemed weapons *per se* constitute "weapons" for the purpose of a conceal-and-carry analysis is "a question of fact, [determined] by applying the common experience of persons in our society to the facts and circumstances in a given case." Although a screwdriver is not considered a weapon *per se* and has many perfectly legal uses, it can be employed as a weapon when wielded with intent to injure. See United States v. Lavender,

---

November 12 were there any problems in that area, up to that -- leading up to the November 12[?]" To this question, Corporal Daughters responded that there had been multiple thefts from automobiles, shootings, handguns recovered, and drug busts in the apartment complex. Thus, Corporal Daughters's description of the offenses was given in response to a question concerning the time period leading up to November 12.

- 13 -

224 F.3d 939, 941 (9th Cir. 2000) (The United States Court of Appeals for the Ninth Circuit categorized a screwdriver as a "dangerous weapon" for the purpose of upholding a sentencing enhancement for a robbery conviction, noting that "[t]here is no doubt that a screwdriver can be used to. . . caus[e] serious bodily injury.").

In United States v. Bullock, 510 F.3d 342, 347 (D.C. Cir. 2007), the United States Court of Appeals for the District of Columbia Circuit ("the D.C. Circuit") noted that instruments that are not considered weapons *per se* may still present a threat to law enforcement officers and, therefore, justify a Terry frisk. In Bullock, 510 F.3d at 347, a law enforcement officer conducted a Terry frisk of the defendant during a traffic stop after forming reasonable suspicion that the defendant had stolen the vehicle. The D.C. Circuit upheld the permissibility of the frisk, concluding that, "[l]ike burglary, car theft is a crime that often involves the use of weapons and **other instruments** of assault that could jeopardize [law enforcement] officer safety, and thus justifies a protective frisk under *Terry* to ensure officer safety." Bullock, 510 F.3d at 347 (emphasis added). Although Bullock involved theft **of** a vehicle rather than theft **from** a vehicle, as in the current case, the instruments that are used in either circumstance are presumably the same. Thus, the D.C. Circuit's reasoning in Bullock is instructive.

Sellman argues that this case is analogous to Simpler v. State, 318 Md. 311, 321, 312-13, 568 A.2d 22, 26-27 (1990), in which this Court concluded that the minor offense of underage drinking did not justify a Terry frisk. I would conclude that this case is distinguishable from Simpler. As discussed above, theft from a vehicle, unlike underage drinking, may involve the use of instruments that could present a danger to law

- 14 -

enforcement officers. Additionally, other courts have held that suspicion of a theft crime may justify a <u>Terry</u> frisk if the officer believes that his or her safety may be at risk in apprehending the individual. <u>See, e.g.</u>, <u>United States v. Griffin</u>, 696 F.3d 1354, 1359, 1357 (11th Cir. 2012) (The United States Court of Appeals for the Eleventh Circuit upheld the constitutionality of a <u>Terry</u> frisk of an individual who was suspected of theft from a clothing store.). <u>Simpler</u>, a case involving underage drinking, provides little guidance as to the resolution of this matter.

The Majority theorizes that a general concern about theft from cars in an area does not provide reasonable suspicion that criminal activity is afoot and does not provide sufficient reasonable suspicion for a frisk. <u>See</u> Maj. Slip Op. at 16-17. Here, a concern about theft from cars was but one aspect of a myriad of factors giving rise to reasonable suspicion that criminal activity was afoot and that Sellman was potentially armed and dangerous. As recognized by the Majority, Sellman was observed coming from a dark area on the side of the apartment building where there was no entrance; the apartment building was in a high-crime area; Sellman behaved nervously upon seeing a law enforcement vehicle and was picked up at a location around the corner, separately from the other occupants of the vehicle; during the stop, Sellman appeared nervous in the vehicle, looking straight ahead and never looking at Corporal Daughters; Corporal Daughters received information from Gillespie that Sellman lived in the apartment complex, while Sellman did not respond; and Sellman provided a false name, "Marcus Neal Saunders," for which there was no information or Motor Vehicle Administration record. Corporal Daughters's testimony was that, after gaining consent to search the vehicle, he decided to frisk Sellman

based on the responses of the occupants in the car and the circumstances that he had observed. Although Corporal Daughters, indeed, testified that, prior to searching the vehicle, he wanted to be sure that no one in the car was armed, the record establishes that he did not testify that this was the sole or primary basis for frisking Sellman.

At its core, the Majority opinion states that the law enforcement officers' observations of Sellman "revealed innocent conduct" and that the officers did not have "an objective reason to support" the suspicion that Sellman was involved in criminal activity or was armed. Maj. Slip Op. at 23. To be sure, each factor observed by the officers—for example, nervousness, coming from a dark area, being in a high-crime area late at night, and Gillespie's statement that Sellman lived at the apartment complex, coupled with Sellman's failure to respond when Daughters asked if anyone in the vehicle lived at the apartment complex—does not constitute a crime in and of itself. It has never been required that reasonable suspicion be based on the observation of actual criminal activity. The entire underpinning of reasonable suspicion is that there are a totality of circumstances sufficient to give rise to the belief that criminal activity is afoot and an individual is armed and dangerous. In my view, such was the case here.

Although the need to protect citizens from unwarranted stops and frisks is of critical importance to the credibility of law enforcement and, ultimately, to the safety of the community, properly applying the law to the facts and evaluating the existence of reasonable suspicion are equally important.

In sum, viewing the evidence in a light most favorable to the State, I would conclude that, under the totality of the circumstances, the evidence is sufficient to establish that

Corporal Daughters had reasonable articulable suspicion to believe that criminal activity was afoot and that Sellman presented a danger to the officers at the time of the frisk. Thus, I would affirm the decision of the Court of Special Appeals, affirming the circuit court's denial of the motion to suppress.

For the above reasons, respectfully, I dissent.

Judge Battaglia has authorized me to state that she joins in this opinion.